## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RICHARD GLEINN and PHYLLIS GLEINN,
CARY TOONE, JOHN CELLI and MARIA
CELLI, EVA MEIER, GEORGIA MURPHY,
STEVEN J. RUBINSTEIN and TRACEY F.
RUBINSTEIN, as trustees for THE
RUBINSTEIN FAMILY LIVING
TRUST DATED 6/25/2010, BERTRAM D.
GREENBERG, as trustee for the Greenberg
Family Trust, and BRUCE R. AND
GERALDINE MARY HANNEN, individually
and on behalf of others similarly situated,

        Plaintiffs,

vs.

PAUL WASSGREN, an individual; DLA
PIPER LLP (US), a limited liability partnership;
and FOX ROTHSCHILD LLP, a limited
liability partnership,

   Defendants.

Case No. _____

**JURY DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Richard Gleinn; Phyllis Gleinn; Cary Toone, John Celli; Maria Celli; Eva Meier;

Georgia Murphy; Steven J. Rubinstein and Tracey F. Rubinstein, as trustees for The Rubinstein

Family Living Trust Dated 6/25/2010; Bertram D. Greenberg, as trustee for the Greenberg Family

Trust; Bruce R. Hannen; and Geraldine Mary Hannen (collectively, "Plaintiffs") allege the

following claims for their complaint against Defendants Paul Wassgren ("Wassgren"), DLA Piper

LLP (US) ("DLA Piper") and Fox Rothschild LLP ("Fox Rothschild") (collectively,

"Defendants"). Plaintiffs allege the following on information and belief, except as to those

allegations that specifically pertain to the named Plaintiffs, which are alleged on personal knowledge.

## INTRODUCTION

1.      Plaintiffs bring this class action against the Defendants to obtain rescission, damages, and/or other relief on behalf of themselves and hundreds of other investors who collectively have lost millions of dollars in a Ponzi scheme orchestrated and perpetrated by the principals of EquiAlt, a private real estate investment firm based in Florida. The Ponzi scheme, which involved the unlawful sale of unregistered securities ("the EquiAlt Securities") through fraudulent misrepresentations, was carried out by the managers of EquiAlt acting in concert with Wassgren, a partner at the Fox Rothschild law firm and, later, a partner at the DLA Piper law firm.

2.      EquiAlt and its promoters could not have perpetuated the massive fraudulent Ponzi scheme without the active assistance and participation of their lawyers, accountants and accommodating banks. This class action is brought on behalf of the EquiAlt investors in (1) Florida, (2) California, (3) Arizona, and (4) Colorado, seeking to hold accountable Wassgren, Fox Rothschild, and DLA Piper—the lawyers who knowingly aided and abetted the fraudulent scheme.

3.      Over time, EquiAlt and Wassgren through integrated offerings of unregistered securities raised more than $170 million from at least 1,100 investors located in various states, including investors residing in Florida, California, Arizona, and Colorado. A large percentage of the EquiAlt investors are elderly and many of them invested their life savings in the unregistered EquiAlt Securities.

4.      On February 11, 2020, the Securities and Exchange Commission ("SEC") in the Middle District of Florida filed an enforcement action against EquiAlt, the EquiAlt investment funds, and the EquiAlt promoters, Brian Davison (Chief Executive Officer) and Barry Rybicki

(Managing Director) seeking injunctive and other relief (the "SEC Action"). The complaint in the SEC Action charges that those defendants operated EquiAlt as a Ponzi scheme and committed multiple violations of the Federal securities laws:

> The Commission brings this emergency action to halt an ongoing fraud conducted by EquiAlt LLC, a private real estate investment company. Beginning in 2011, to the present, Defendants EquiAlt, Brian Davison and Barry Rybicki conducted a Ponzi scheme raising more than $170 million from over 1,000 investors nationwide, many of them elderly, through fraudulent unregistered securities offerings. Defendants promised investors that substantially all of their money would be used to purchase real estate in distressed markets in the United States and their investments would yield generous returns. Instead, EquiAlt, Davison and Rybicki misappropriated millions in investor funds for their own personal use and benefit.

Complaint for Injunctive and Other Relief and Demand for Jury Trial, ¶ 1, copy attached as **Exhibit A.**

5.      Three days after the SEC filed the SEC Action, EquiAlt was placed into a liquidating receivership. On May 8, 2020, the EquiAlt Receiver ("The Receiver") filed its first quarterly report, a copy of which is attached as **Exhibit B** ("the Receiver's Report"). The Receiver's Report includes extensive findings regarding the operations of the EquiAlt Ponzi scheme. In particular, the Receiver reported:

> These [EquiAlt] investments were sold without registration with either state or federal regulatory agencies. The offerings were purportedly made pursuant to federal exemptions from registration under the provisions of the Securities Act of 1933 provided in Regulation D. However, none of the first four [EquiAlt] Funds qualified for a Regulation D exemption or any other exemption from registration. The offerings appear to be one continuous fraudulent offering of unregistered securities. The lack of any exemption was clear to the perpetrators from the language contained in offering documents delivered to investors.

**Ex. B** at 14.

## PARTIES AND NON-PARTY ACTORS

### PLAINTIFFS

6.      Plaintiffs Richard and Phyllis Gleinn are individuals and spouses, who reside and are domiciled in Sumter County, Florida. The Gleinns are investors in EquiAlt Securities.

7.      Plaintiff Cary Toone is an individual who resides and is domiciled in the State of Arizona. Toone is an investor in EquiAlt Securities.

8.      Plaintiffs John and Maria Celli are individuals and spouses who reside and are domiciled in the State of Arizona. The Cellis are investors in EquiAlt Securities.

9.      Plaintiff Steven J. and Tracey F. Rubinstein are individuals and spouses who reside and are domiciled in the State of Arizona. The Rubinsteins are trustees of the Rubinstein Family Living Trust Dated 6/25/2010, which invested in EquiAlt. The Rubinsteins, via their trust, are investors in EquiAlt Securities.

10.      Plaintiff Eva Meier is an individual who resides and is domiciled in San Diego, California. Meier is an investor in EquiAlt Securities.

11.      Plaintiff Georgia Murphy is an individual who resides and is domiciled in San Diego, California. Meier is an investor in EquiAlt Securities.

12.      Plaintiff Greenberg is the trustee of the Greenberg Family Trust, a revocable trust. Plaintiff Bert Greenberg is, and was at all material times, who resides and is domiciled in Santa Clara County, California. Greenberg is an investor in EquiAlt Securities.

13.      Plaintiffs Bruce R. Hannen and Geraldine Mary Hannen are spouses and individuals who reside and are domiciled in the state of Colorado. The Hannens are investors in EquiAlt Securities.

## DEFENDANTS

14.    Defendant DLA Piper is a Maryland limited liability partnership operating as a law firm with its principal place of business at 6225 Smith Avenue, Baltimore, MD 21209. DLA Piper is thus a citizen of Maryland. DLA Piper does business in Florida at 200 South Biscayne Boulevard, Suite 2500, Miami, Florida.

15.    Defendant Fox Rothschild is a Pennsylvania limited liability partnership operating as a law firm with its principal place of business located at 2000 Market St, 20th Floor, Philadelphia, PA, 19103. Fox Rothschild is thus a citizen of Pennsylvania. Fox Rothschild does business in Florida at One Biscayne Tower, 2 South Biscayne Blvd., Suite 2750, Miami Florida.

16.    Fox Rothschild and DLA Piper served as EquiAlt's legal counsel in connection with the offer and sale of the EquiAlt Securities

17.    Defendant Wassgren is an individual who resides and is domiciled in the State of California. Wassgren is thus a citizen of California. Wassgren is an attorney who has been a partner at DLA Piper since 2017. Prior to his affiliation with DLA Piper, Wassgren was a partner at Fox Rothschild. At all times relevant to the allegations of this complaint, Wassgren was acting within the course and scope of his employment with Fox Rothschild and his later employment with DLA Piper.

## OTHER NON-PARTY ACTORS

18.    Non-defendant EquiAlt LLC ("EquiAlt") is a Nevada limited liability company that engaged in the offer and sale of the EquiAlt Securities to investors in several states, including Florida.

19.    Non-defendant Brian Davison ("Davison") is the former CEO of EquiAlt.

20.     Non-defendant Barry Rybicki (Rybicki") is a Managing Director of EquiAlt.

21.     Non-defendants EquiAlt Fund LLC ("Fund 1"); EquiAlt Fund II, LLC ("Fund 2"), EquiAlt Fund III, LLC ("Fund 3") and EA SIP LLC ("Fund 4") (collectively, the "Funds") are investment funds formed by Non-Defendants Davison and Rybicki to raise monies from investors through the sale of the EquiAlt Securities.

22.     Non-Defendants EquiAlt, the Funds, Davison, and Rybicki are hereinafter referred to collectively as the "Non-Defendant Promoters."

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs; each alleged class will have 100 or more members, and minimal diversity exists.

24.     This Court has personal jurisdiction over each Defendant because each Defendant was involved in the marketing and sale of the EquiAlt Securities issued from EquiAlt headquarters in Tampa, Florida. Defendants have purposefully availed themselves of the laws of the State of Florida and have established minimum contacts with the State of Florida. The Court also has personal jurisdiction under Fla. Stat. §§ 48.193(1)(a)(1) over the Defendants because they operate, conduct, engage in, or carrying on a business or business venture in this state or having an office or agency in this state. Both Fox Rothschild and DLA Piper transact substantial business in Florida, including from a DLA office in Miami, Florida, and Fox Rothschild offices in Miami and West Palm Beach, Florida. Defendants market, promote, distribute, and render their services in Florida, causing Defendants to incur both obligations and liabilities in Florida. Further, the Court has personal jurisdiction over Wassgren under Fla. Stat. § 48.193(1)(a)(2).

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. In addition, the SEC Action was filed in this district.

## GENERAL ALLEGATIONS

### A.     Background of the EquiAlt Ponzi Scheme

26.     EquiAlt was formed in 2011 by its Chief Executive Officer Davison and its Managing Director Rybicki (collectively, the "Managers"). EquiAlt represented to its investors in offering documents that substantially all of their invested funds would be used to purchase, rehabilitate and sell for profit single-family properties located in distressed markets throughout the United States, thereby generating generous returns of 8–12% for the investors. Instead, EquiAlt, Davison, and Rybicki with the active assistance of Defendants perpetrated an illegal Ponzi scheme by which they fraudulently misappropriated millions of dollars for their own personal benefit from the offer and sale of unregistered securities in violation of the federal and state securities laws, through a network of unlicensed sales agents located in Florida, California, Arizona, Colorado, and other states.

27.     According to the Declaration of Mark Dee filed in the SEC action, EquiAlt morphed into a Ponzi scheme soon after its inception in 2011. A copy of the Declaration of Mark Dee (the "Dee Declaration") is attached as **Exhibit C.** Mr. Dee, a Senior Accountant for the SEC, attested that Davison and Rybicki misappropriated millions of dollars for their own personal benefit, misused investor funds for purposes inconsistent with the Private Placement Memorandums used to offer and sell the EquiAlt Securities ("PPMS"), and saddled the Funds with financial losses stemming from excessive fees, bonuses and payments to insiders and affiliated entities. In short order the proceeds received by the Funds from property sales and loan receipts were inadequate to pay the high payments due to investors under the unregistered EquiAlt

Securities, which obligated the Funds to pay interest to investors at rates ranging from 8% to 12%. Consequently, EquiAlt systematically diverted monies from one Fund to another and used investment proceeds raised from new investors to make the interest payments due to existing investors.

28.     EquiAlt conducted its business affairs and perpetrated an illegal and fraudulent Ponzi scheme through a series of limited liability companies ("LLCs") controlled by Davison and Rybicki. EquiAlt itself was formed as a Nevada LLC to manage a series of real estate investment funds that issued and sold to investors unregistered securities styled as fixed-interest debentures. The unregistered EquiAlt Securities were issued by the Funds. Another LLC operated by Rybicki, BR Support Services LLC ("BR Services"), was formed in Arizona to recruit, oversee and pay commissions to the unlicensed sales agents who marketed and sold the unregistered EquiAlt Securities to unsuspecting investors.

29.     Shortly after EquiAlt was formed in 2011, Davison and Rybicki began to aggressively promote sales of the EquiAlt Securities issued by Fund 1 through a network of unlicensed sales agents located in Florida, California, Arizona, and other states. Davison managed EquiAlt's financing and day-to-day operations, including the acquisition and development of properties owned by the Funds. Rybicki solicited and oversaw the activities of the unlicensed sales agents, communicated with investors and raised monies from investors.

30.     Over time, Rybicki recruited approximately 19 sales agents through BR Services. Participating sales agents would submit to BR Services certain documentation and the investors' funds, which BR Services would transmit to EquiAlt. When the investor funds were received, EquiAlt would disburse funds to BR Service equal to 12% of the invested amounts and BR Services in turn would pay commissions to the agents equal to 6% or more of the invested amounts.

For example, the following chart from the Receiver's Report lists sales commissions paid to the sales agents recruited by Rybicki in California alone:

| Sales Agent Name | Total Paid |
|---|---|
| Agents Insurance Sales / Barry Wilken | $ (240,159.33) |
| American Financial Security / Ron Stevenson / Barbara Stevenson | (1,712,750.95) |
| Barry Neal | (119,037.20) |
| Ben Mohr | (113,578.00) |
| Bobby Armijo / Joseph Financial Inc. | (1,100,042.65) |
| Dale Tenhulzen / Live Wealthy Institute | (1,484,531.29) |
| Elliot Financial Group / Todd Elliot | (805,662.68) |
| Family Tree Estate Planning / Jason Wooten | (3,749,783.61) |
| GIA, LLC / Edgar Lozano | (278,807.24) |
| Greg Talbot | (260,941.89) |
| J. Prickett Agency / Joe Prickett | (187,374.57) |
| James Gray / Seek Insurance Services | (405,286.75) |
| John Friedrichsen | (327,681.69) |
| Lifeline Innovations / John Marques | (822,318.06) |
| Patrick Runninger | (293,599.53) |
| Sterling Group | (478,562.12) |
| The Bertucci Group LLC / Leonardo LLC / Leonardo Bertucci | (139,950.00) |
| Tony Spooner / Rokay Unlimited, LLC | (622,169.05) |
| Wellington Financial, LLC / Jason Jodway | (48,000.00) |
| **TOTAL** | **$ (13,190,236.61)** |

As the foregoing chart shows, the EquiAlt sales agents collected more than $13 million in commissions from sales of the EquiAlt Securities to California residents alone.

31.     Rybicki selected agents who had existing clients with whom they had pre-existing confidential fiduciary relationships of trust and confidence. The sales agents, who were largely unlicensed insurance producers and financial advisors, provided investment advice concerning the EquiAlt Securities, counseling their clients that the debentures were conservative, safe investments providing healthy investment returns with little or no investment risk. The sales agents purported to conduct sufficient analysis to confirm that prospective investors possessed the knowledge and expertise in financial and business matters and the capability to evaluate the merits and risks associated with the EquiAlt Securities. Rather than doing so, however, the EquiAlt sales agents improperly endorsed the EquiAlt Securities as low risk investments and affirmatively encouraged and exhorted their largely unsophisticated clients to invest their life savings and retirement assets in the risky unregistered securities.

32.     A majority of the investors who purchased the unregistered securities issued by the Funds were non-accredited, meaning that their net worth was less than $1 million, their individual income was less than $200,000 in each of the two most recent years (or $300,000 in joint income with their spouse), or they failed to meet the other requirements of 17 CFR § 230.501. In addition, to be accredited, purchasers must have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of the prospective investment. Under Regulation D, the safe harbor exemption from registration is forfeited if the issuer sells its unregistered securities to more than 35 non-accredited purchasers. When the EquiAlt Securities offerings by the Funds are aggregated, it is clear that EquiAlt had more than 35 non-accredited purchasers because the Form D for the Fund 1 offering discloses 31 non-accredited purchasers and the Form D for Fund II discloses 10 non-accredited purchasers, for a total of at least 41 non-accredited purchasers of EquiAlt Securities.

**B.    Defendants' Active Participation and Assistance in the Offer and Sale of the Unregistered EquiAlt Securities**

33.    As a partner at Fox Rothschild and later as a partner at DLA Piper, Wassgren served as legal counsel for EquiAlt who advised and assisted EquiAlt on numerous matters, including compliance with applicable Federal and State securities laws. In a recent podcast, Wassgren described EquiAlt as "a long-time client of mine."[1] DLA Piper's website notes that Wassgren represented EquiAlt in connection with "[f]und and REIT formations, including a series of private [securities] offerings."[2] According to the DLA Piper website, Wassgren "practices at the intersection of corporate law, real estate and securities."[3] Despite his youthful age, therefore, Wassgren is a highly sophisticated securities lawyer, well-versed in the stringent federal and state law provisions regulating the offer and sale of securities to investors in California, Arizona, Florida, and Colorado, including in particular the prohibitions against public offerings of unqualified or unregistered securities through unlicensed brokers and sales agents.

34.    Wassgren represented EquiAlt for several years as a partner at Fox Rothschild. Wassgren brought EquiAlt with him as a client when he joined DLA Piper in 2017. Wassgren had primary responsibility for the EquiAlt engagements of Fox Rothschild and DLA Piper. As recently as 2018, and after defending the Arizona investigation into EquiAlt's operations described below, Wasserman led a team of DLA Piper attorneys assisting EquiAlt in the formation and offering of $500 million fund to purchase and develop properties within Qualified Opportunity Zones.

35.    Over the years, Fox Rothschild and DLA Piper collected hundreds of thousands of dollars in fees from EquiAlt and its affiliates from EquiAlt and the Funds.

---

[1] https://podcasts.apple.com/kw/podcast/paul-wassgren-from-youngest-bond-trader-ever-to-oz/id1460212490?i=1000438104456 (last visited June 15, 2020)

[2] https://www.dlapiper.com/en/us/people/w/wassgren-paul/ (last visited June 15, 2020).

[3] *Id.*

36.     Wassgren was deeply involved with EquiAlt and the Funds from their very inception. In his deposition taken in the SEC investigation leading up to the SEC Action, EquiAlt CEO Davison described Wassgren's instrumental role as architect of the EquiAlt business organizations:

> Q:     The second full paragraph on page 3 states … "As the CEO and founder, Mr. Davison … actively works with EquiAlt outside legal and financial advisors to develop and implement strategic ling-term planning for the company…." Is that an accurate description of your responsibilities at EquiAlt?
>
> ***
>
> A:     … I just would like to clarify that my definition of financial advisors is directly related to my job position, which would be Denver, a staff CPA with great experience, ***my legal counsel, Paul Wassgren, I deal with quite extensively when the companies interact with each other that he's built for me,*** to make sure I'm good on that. But other than that, I would say that paragraph is generally accurate, yes.

Deposition of Brian Davison, excerpt attached as **Exhibit D**, at 21 (emphasis added).

37.     While a partner at Fox Rothschild and later, as a partner at DLA Piper, Wassgren prepared and filed with the Nevada Secretary of State the Articles of Organization for each of the Funds, listing himself as the "Organizer" and "Registered Agent" for the Funds. Wassgren also drafted the PPMs used by EquiAlt to solicit sales of its unregistered and nonqualified securities. As Davison testified to the SEC:

> Q:     And who developed the concept of raising money for these investment funds through private placement memorandums?
>
> A:     That's me.
>
> ***
>
> Q:     Okay. So who contacted the law firm to help generate those private placement memorandums?
>
> A:     I do.

Q:     Okay. It was you?

A:     It was me.

***

Q:     And which law firm, and which attorney, and when?

A:     So the individual is Paul Wassgren.

***

Q:     Fox Rothschild? Does that sound familiar?

A:     He was at Fox Rothschild.

Q:     Which firm is he at now?

A:     I believe he's with DLA Piper.

**Ex. D** at 26–27. Copies of PPMs drafted by Wassgren for each of the Funds are attached as **Composite Exhibit E**.

38.     Wassgren also drafted the Subscription Agreements, the EquiAlt Securities, and the Prospective Purchaser Questionnaires ("Investor Questionnaires") used to attest that the investors were "accredited," a requirement for the securities to be exempt from registration as a "private offering" under Rule 506(b) of SEC Regulation D ("Regulation D"). An exemplar Investor Questionnaire is attached as **Exhibit F**. As drafted, the Investor Questionnaires were addressed to Fox Rothschild or DLA Piper, such that prospective investor was directed to complete the questionnaire and send the signed document to the Defendants' offices. Through their receipt of such Investor Questionnaires, and otherwise, Defendants kept themselves informed of the number and level of financial sophistication of the prospective investors to whom the EquiAlt Securities were being offered and sold.

39.     The PPMs and other offering documents prepared by Wassgren contained numerous false and misleading statements and concealed or omitted material information about the use of investors' funds and the risks associated with the Funds. Among other material misrepresentations, the PPMs prepared by Wassgren:

- Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

- Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

- Falsely stated that "[u]nder no circumstances will the Company admit more than thirty-five (35) non-accredited Investors as computed under Rule 501 of Regulation D promulgated under the [Securities] Act;"

- Falsely stated that "[t]he Company may utilize the services of one or more registered broker/dealers" to sell the unregistered securities;

- Falsely overstated the percentage of investor funds that would be used to invest in properties;

- Misleadingly omitted to disclose that millions of dollars would be used to pay undisclosed fees and bonuses to EquiAlt and its principals;

- Misleadingly omitted to disclose that EquiAlt would pocket "discount fees" rather than passing on to the Funds purported savings from listed sale prices; and

- Misleadingly omitted to disclose that monies would be transferred from one Fund to another to pay interest due to investors and failed to adequately disclose that commissions would be paid to unlicensed sales agents.

- Misleadingly omitted to disclose that Davison and Rybicki had both filed bankruptcy proceedings during the years prior to the formation of EquiAlt

40.     In addition to drafting and providing information for the PPMs, Wassgren and the law firm Defendants consented to the inclusion of their names in the PPMs and the associated offering materials incorporated in the PPMs. As just noted, while Wassgren was a partner at Fox Rothschild, the Investor Questionnaires attached as exhibits to the PPMs named the law firm and directed the investors to mail the completed questionnaires to the law firm's offices in Nevada.

When Wassgren moved to DLA Piper in 2017, the Investor Questionnaires were changed to name DLA Piper and set forth the new law firm's mailing address in California. The PPMs also stated that: (a) the securities were offered "subject to … [the] approval of counsel;" (b) the fund's "counsel will review certain documents" used to effectuate the real estate transactions by which the Funds intended to acquire properties; (c) the Fund "will rely on the opinion of … its legal counsel with respect to its classification as a limited liability company for Federal income tax purposes;" and (d) the securities could not be transferred unless, among other things, "in the opinion of counsel to the company, registration is not required…." These statements concerning the legal advice to be obtained from EquiAlt's counsel all referred to Wassgren and the law firm Defendants.

41.     Wassgren and the law firm Defendants furthermore knowingly allowed EquiAlt to use their names and professional reputations in marketing materials distributed to prospective investors. While Wassgren was a partner at Fox Rothschild, EquiAlt marketing brochures (an example of which is attached as **Exhibit G**) prominently featured Wassgren and Fox Rothschild as the investment firm's legal counsel, thereby providing comfort to prospective investors that EquiAlt was a legitimate, financially sound investment firm that complied with all applicable regulatory and legal requirements. When Wassgren subsequently became a partner at DLA Piper, the EquiAlt marketing brochure (an example of which is attached as **Exhibit H**) was changed to reflect that Wassgren and DLA Piper served as legal counsel for EquiAlt. Both EquiAlt marketing brochures invited prospective investors to contact Defendants directly, identifying them as

"independent" professionals who offered to give the investors "insight into the fund and its activities." *Id.*[4]

42.    Wassgren knew the representations in the PPMs that the EquiAlt Securities were exempt from registration under the federal securities laws pursuant to Regulation D and were made "in strict compliance with the applicable state securities laws" were false and misleading. Among other things, Wassgren knew that: (a) EquiAlt intended to sell and did in fact sell its securities to more than 35 non-accredited investors through the Funds, which were all part of a single integrated offering; (b) EquiAlt engaged directly and through its agents in general solicitations and

---

[4] DLA Piper through numerous press releases also touted to the public the law firm's involvement and major role in assisting EquiAlt, but has since removed these specific website announcements:

> DLA Piper advises EquiAlt on the formation and offering of its ...www.dlapiper.com › news › 2018/11 › dla-piper-advises-EquiAlt-on-q...
>
> Nov 15, 2018 – DLA Piper represented EquiAlt LLC, in the formation and offering of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that ...

> Paul Wassgren | People | DLA Piper Global Law Firmwww.dlapiper.com › people › wassgren-paul
>
> DLA Piper represented EquiAlt LLC, in the formation and offering of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that purchases and ...

> https://www.leopardsolutions.com/hotspot/ListSummaryDetails.aspx?categoryid=0&month=11&year=2018
>
> DLA Piper advises EquiAlt on the formation and offering of its US$500 million Qualified Opportunity Zone fund

> DLA Piper - @DLA_Piper Twitter Profile | Twipuwww.twipu.com › DLA_piper
>
> Explore @DLA_Piper Twitter Profile | DLA Piper, a global law firm operating through ... We advised EquiAlt on the formation and offering of its US$500 million ...

CLASS ACTION COMPLAINT

advertising to market its unregistered securities; (c) EquiAlt made commission payments to its unlicensed sales agents not disclosed in its SEC filings claiming the Reg D exemption from registration; and (d) EquiAlt would and did fail to provide investors with information and disclosures required by Regulation D, including audited financial statements.

43.     Aware that EquiAlt failed to qualify for its claimed registration exemption yet was offering and selling the unregistered securities using unlicensed sales agents, Wassgren knew that his clients were engaged in multiple ongoing violations of the applicable federal and state securities laws.

44.     Wassgren also actively assisted EquiAlt's ongoing securities law violations by developing a stratagem to mischaracterize the sales agents as mere "Consultants" being paid "finders fees" as a subterfuge to facilitate the offer and sale of the EquiAlt Securities by unlicensed dealers. In furtherance of this unlawful contrivance, Wassgren drafted a so-called "Finder's Fee Agreement" between the applicable investment fund and the unlicensed sales agents, a copy of which is attached as **Exhibit I**. The Finder's Fee Agreement drafted by Wassgren acknowledged that the fund would "compensate" the sales agents for "introducing the Company [fund] to Investors who may be interested in considering a potential investment in the Company." *Id.* at 1. Although Wassgren was-well aware that the sales agents would be providing investment advice to their current and prospective clients (to whom they owed fiduciary duties), Wassgren drafted the Finder's Fee Agreement to falsely represent that each agent would not "make representations concerning the terms, conditions or provision of any possible investment" in the EquiAlt Funds. *Id.* at 2.

45.     Recognizing that the contemplated activities of the EquiAlt sales agents contravened both Federal and State securities laws, Wassgren drafted the Finder's Fee Agreement

to provide for indemnification of both the EquiAlt fund and the agent against losses incurred by either of them arising from the "Consultant's failure to register as a broker-dealer with the Securities and Exchange Act of 1934, or as required by applicable state law or Consultant's violation of state or federal securities laws and regulations." *Id.* at 3. Acknowledging Wassgren's contemplated continued participation in the ongoing securities law violations, the Finder's Fee Agreement provided that any notices required under the agreement, including notice of claims arising from securities laws violations, was to be provided to Wassgren himself on behalf of the EquiAlt Funds. *Id.* at 5.

46.     Rather than disclosing the ongoing securities violations or withdrawing from further representation (as required by the applicable ethical rules), Wassgren instead assisted EquiAlt in its attempt to conceal those violations. To that end, as alleged more fully below, Wassgren orchestrated the creation of multiple purportedly separate investment funds in an attempt to conceal the number of unaccredited investors to whom the unregistered securities were sold. Wassgren also assisted in the preparation of materially false SEC filings which—to conceal EquiAlt's ongoing securities law violations—intentionally understated the number of non-accredited EquiAlt Fund investors and misrepresented the nature and amount of commissions paid to the unlicensed sales agents.

47.     In sum, Wassgren (a) was knowing participant in the ongoing illegal sales of securities by the Non-Defendant Promoters, (b) played a substantial role in inducing the illegal sales, and (c) lent substantial assistance to an ongoing scheme to defraud. Wassgren knew or should have known that under the standards of the legal profession, "[A] lawyer has an obligation not knowingly to participate in any violation by the client of the securities laws." ABA Statement

of Policy on Lawyer Responses to Auditor Requests for Information. [5] In these circumstances, Wassgren was professionally obligated to terminate its representation to avoid covering-up and assisting the ongoing (and past) fraud perpetrated by the Non-Defendant Promoters. He did not do so.

48.     Not only that, but Wassgren's actions in assistance to and in concert with the Non-Defendant Promoters went far beyond his role as legal counsel to EquiAlt. Wassgren even went so far as to affirmatively provide legal advice to potential and existing *sales agents*, falsely assuring them that EquiAlt was in compliance with all applicable securities laws and that the unlicensed agents could lawfully sell the EquiAlt unregistered and unqualified securities. Yet Attorney Wassgren knew the EquiAlt Securities did not qualify for a public offering exemption under federal or state law. Wassgren also knew that the sales agents selling the EquiAlt Securities were not registered as dealers or salespersons under federal and state securities laws. Nonetheless, in furtherance of the ongoing Ponzi scheme, Wassgren personally, systematically, affirmatively, and falsely represented to the sales agents that they could lawfully sell the unregistered EquiAlt Securities—never disclosing that EquiAlt and the agents were violating the federal and state securities laws by selling unregistered securities and by selling investments for EquiAlt without registering as a securities dealer.

49.     In addition to actively assisting EquiAlt and the Non-Defendant Promoters by drafting false offering documents, preparing organizational documents for the Funds and for other entities in which properties were held, advising and assisting EquiAlt's efforts to avoid registration

---

[5] *See also In re Am. Cont'l Corp./Lincoln Sav. and Loan Secur. Litig.*, 794 F. Supp. 1424, 1452 (D. Ariz. 1992) ("An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, and where it is obvious that the attorney's compliant legal services may be a substantial factor in permitting the deceit to continue.").

under the applicable securities laws and providing false assurances to the sales agents, CEO Davison has testified that Wassgren actively assisted him in developing and implementing strategic long-term planning for EquiAlt, again assistance beyond the scope of the routine rendition of legal services.

### C.     The EquiAlt Securities Are Non-Exempt Unregistered/Unqualified Securities

50.    The EquiAlt Securities are securities within the meaning of the Securities Act of 1933 ("the Federal Act"), which unless exempt must be registered before being offered or sold in the United States. 15 U.S.C. §77e.

51.    The EquiAlt Securities are likewise securities under the Florida Securities and Investor Protection Act (the "FSIPA"), which unless exempt must be qualified before being offered or sold in Florida unless they are exempt from registration under the Federal Act. § 517.07, Fla. Stat.

52.    The EquiAlt Securities are likewise securities under the California Securities Law of 1968 ("CSL"), which unless exempt must be qualified before being offered or sold in California unless they are exempt from registration under the Federal Act. Cal. Corp. Code §25102(o).

53.    The EquiAlt Securities are likewise securities under the Arizona Securities Act ("ASA"), which unless exempt must be qualified before being offered or sold in Arizona unless they are exempt from registration under the Federal Act. § 44-1841, Ariz. Stat.

54.    The EquiAlt Securities are likewise securities under the Colorado Securities Act ("CSA"), which unless exempt must be qualified before being offered or sold in Arizona unless they are exempt from registration under the Federal Act. C.R.S. § 11-51-201.

55.     Defendants prepared the PPMs for the EquiAlt Securities, which acknowledged them as "securities," and which described the raised funds as being used to purchase, improve,

lease and sell single-family properties in distressed real estate markets in the U.S. and to participate in "opportunistic loan transactions" in the United States.

56.     Recognizing that the EquiAlt Securities are securities within the meaning of the Federal Act and the FISPA, the CSL, and the ASA, Defendants provided legal advice to, drafted documents for and otherwise actively assisted EquiAlt in falsely claiming an exemption from registration as a "private offering" under Rule 506(b) of SEC Regulation D ("Rule 506").

57.     Rule 506(b) is considered a "safe harbor" under Section 4(a)(2) of the Federal Act. It provides objective standards that a company can rely on to meet the requirements of the Section 4(a)(2) exemption. Companies conducting an offering that qualifies under Rule 506(b) can raise an unlimited amount of money and can sell securities to an unlimited number of accredited investors.

58.     An offering under Rule 506(b) is, however, subject to the following requirements:

- ▪ no general solicitation or advertising to market the securities may be conducted; and
- ▪ securities may not be sold to more than 35 non-accredited investors (all non-accredited investors, either alone or with a purchaser representative, must meet the legal standard of having sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the prospective investment).

Furthermore, as a general condition to a Rule 506(b) exemption, all non-accredited investors must be given specific information relating to the offeror's financial condition. 17 C.F.R. § 230.502(b).

59.     Defendants advised EquiAlt with respect to the required filings with the SEC to claim an exemption from registration under Regulation D. Defendants therefore had actual knowledge of the requirements EquiAlt was required to follow in order to exempt the offer and sale of the EquiAlt Securities from the registration requirements under the Federal and State securities statutes.

60.     However, through their active involvement in the documentation, offering and sales of the EquiAlt Securities, their interactions with EquiAlt and its principals and its interactions with the EquiAlt sales agents and securities regulators, Defendants knew that the EquiAlt Securities were in fact offered and sold in non-compliance with the requirements of Regulation D.

61.     First, Defendants knew that investments in the EquiAlt Securities were being solicited through general solicitations and advertisements, including (a) newspaper ads such as in the attached **Exhibit J**, and (b) group presentations such as the slideshow attached as **Exhibit K** ; and (c) sales brochures such as the attached **Exhibits G** and **H**. Defendants also knew that in-house employees at EquiAlt were soliciting investments from the general public through cold-calling campaigns, social media, websites, in-person meetings, and info-dinners.

62.     Second, Defendants drafted the subscription materials to be completed by potential investors to confirm the accredited or non-accredited status of the potential investors. Defendants drafted those subscription materials for completion and return directly to their offices for review by Wassgren, and thereby received direct reports of the number, age, geographic location, and financial sophistication of the investors to whom the EquiAlt Securities were being offered and sold. Defendants thus knew that many of the investors had indicated they were unaccredited or unsophisticated in that they lacked knowledge and expertise in financial or business matters, were not capable of evaluating the merits and risks of the investment, and were not otherwise capable of bearing the economic risks of the investment. Defendants also knew that far more than the maximum permitted number of the unaccredited investors had been sold the EquiAlt Securities, a prohibition which they attempted to circumvent through the creation of purportedly distinct Funds.

63.     Third, Defendants knew that EquiAlt has not satisfied the general condition that the offerors supply all non-accredited investors with the EquiAlt financial reports and information required under Rule 502(b).

64.     Fourth, Defendants aware of, and knowingly permitted, EquiAlt's promotion of Wassgren, DLA Piper, and Fox Rothschild as legal counsel who could vouch for EquiAlt and the legality of the unregistered offer and sale of EquiAlt Securities. For example, EquiAlt's general solicitation materials not only identified DLA Piper or Fox Rothschild as its attorney in connection with EquiAlt's offering, but furthermore supplied the address and phone number for their California offices, and explicitly told investors that Defendants would vouch for the legality of EquiAlt's securities offering and its use of the funds raised through it:

- **Can I contact EquiAlt's CPA or Attorney?** Absolutely, both are independent from EquiAlt LLC and can give you some insight into the fund and its activities.

**Ex. G**; **Ex. H.**

65.     Defendants continued to permit EquiAlt to promote Wassgren and DLA Piper as "independent" legal counsel who investors could contact to obtain information about the EquiAlt Funds and their activities as the Ponzi scheme unfolded, even during the SEC investigation in 2019. **Exhibit L**.

66.     Defendants thus agreed to actively assist in the offer and sale of the EquiAlt Securities in order to generate fees and enhance their professional reputation. Indeed, DLA Piper specifically touted its relationship with EquiAlt in other online posts, press releases, and tweets. *See supra*, ¶ 41 n.4 (collectively, the "DLA-EquiAlt Posts").

67.     Fifth, Defendants also knew that the EquiAlt Securities were being offered and sold in California, Arizona, Florida, Colorado and elsewhere by unlicensed securities broker-dealers

and sales agents who were paid commissions by EquiAlt to do so. But Defendants further knew those commissions were not reported in EquiAlt's SEC filings.

68.     Sixth, Defendants actively assisted the offer and sale of the EquiAlt Securities by unlicensed securities broker-dealers and sales agents by assuring them that such sales complied with the operative securities laws.

**D.     Defendants Intended to Deceive the EquiAlt Investors**

69.     In addition to their active participation in the fraudulent scheme by drafting misleading offering documents used to induce investors to purchase the EquiAlt Securities, forming the Funds used to perpetrate the Ponzi scheme, providing false assurances to sales agents and investors and assisting in the ongoing affairs of EquiAlt, Defendants actively assisted EquiAlt and its principals in concealing the ongoing securities law violations from the investors, the SEC and state regulators. These actions were all undertaken to deceive EquiAlt's existing and prospective investors into believing that the sale of unregistered securities by the Funds complied with the securities laws, which Defendants knew was an outright lie, and to conceal that the falsity of the representation in the PPMs that the offerings were "being made in strict compliance with the applicable state securities laws."

**1.     *Wassgren Orchestrates Formation of Multiple Funds and False SEC Filings to Conceal EquiAlt's Ongoing Securities Violations***

70.     To qualify for an exemption from registration under Regulation D, issuers must file a submission known as a "Form D" electronically with the SEC no later than 15 days after they first sell securities to the investing public. Form D is a brief notice that includes certain specified details concerning the issuing company's promoters, the total offering amount, commissions paid to agents, the existence of non-accredited investors and similar information.

71.     A person who willfully fails to file a Form D or who willfully makes a false statement in a registration statement is guilty of a felony under the Federal securities laws. *See* 15 USC § 77x. Also, under 17 CFR § 239.500(a)(3)(i), an issuer must file an amendment to a previously filed Form D to correct any material errors in any previously filed Form D.

72.     In furtherance of the ongoing fraudulent scheme, Wassgren drafted, reviewed and/or approved numerous Form Ds signed by Davison and submitted to the SEC on behalf of the EquiAlt Funds in order to claim the benefit of an exemption from registration under Regulation D. See Exhibit Y. As alleged in the following paragraphs, Wassgren helped orchestrate a pattern of falsified Form D filings with the SEC calculated to paper over and conceal that the EquiAlt Securities did not qualify for an exemption under Regulation D and, accordingly, from its inception EquiAlt was illegally selling unregistered securities using unlicensed sales agents in violation of the federal and state securities laws.

73.     Acting on behalf of EquiAlt, Attorney Wassgren filed the articles of organization for Fund 1 with the Nevada Secretary of State on May 23, 2011. Two months later, on July 19, 2011, EquiAlt Fund 1 filed its initial Form D with the SEC attesting that the securities to be issued by the fund were exempt from registration under Regulation D and that the total offering amount for Fund 1 was $50 million. The initial Form D for Fund 1 also attested that: (a) the first sale of securities issued by the fund had yet to occur; (b) the fund paid no commissions or finders' fees associated with sales of its securities; (c) no amount of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers, directors or promoters; and (d) Brian Davison was the sole related person associated with the fund. By signing the Form D, Davison attested that "[e]ach Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person."

74.     The foregoing attestations in the Fund 1 Form D filing with the SEC were false when made. Contrary to those attestations, the first sale of securities issued by Fund 1 were made in January 2011, months before the Form D was filed with the SEC, Fund 1 had paid commissions to unlicensed sales agents, and, in addition to Davison, Rybicki was a related person associated with Fund 1. Furthermore, although the Fund 1 Form D (and all other subsequent Form D filings) attested that no portion of the offering proceeds would be paid to any related persons, in reality EquiAlt paid Davison and Rybicki tens of millions of dollars raised through the securities offerings through undisclosed due diligence fees, management fees, success fees, auction fees, underwriting fees purchase discount fees, bonuses and outright improper cash distributions.

75.     Wassgren, who actively assisted in the preparation and filing of the Form D, knew that these attestations in the Fund 1 initial Form D filing were false. Among other things, Wassgren knew that proceeds from the sales of securities issued by Fund 1 were being paid as commissions to unlicensed sales agents in contravention of applicable state and federal securities laws. In fact, Wassgren advised the EquiAlt managers to mischaracterize the unlicensed sales agents as "consultants" and to likewise mischaracterize the commission payments as "finders fees." Wassgren knew that the EquiAlt sales agents were unlicensed sales agents who could not possibly qualify as "finders" or mere "consultants" because, among other things, they received transaction-based compensation, provided financial and suitability advice to prospective investors, actively located and solicited prospective investors and distributed PPMs and Subscription Agreements to prospective investors. As a consequence, Wassgren knew that, from the inception of Fund 1, EquiAlt was operating in violation of federal and state securities laws, exposing EquiAlt to civil and criminal penalties, investor claims for rescission, and inexorable ineligibility to participate in further Regulation D exempt offerings.

76.     The Form D also falsely attested that no portion of the offering proceeds would be paid to any of the executive officers or promoters of the fund when, in fact, the EquiAlt managers intended to and did divert millions of dollars of the offering proceeds to themselves.

77.     As a result of its aggressive solicitation of elderly and unsophisticated investors with limited assets and modest income, EquiAlt soon sold fixed rate debentures issued by Fund 1 to far more than 35 unaccredited and unsophisticated investors, thereby blowing its claimed registration exemption under Regulation D. EquiAlt further blew its registration exemption by soliciting investments from the general public through cold call solicitations, seminar presentations, media advertisements, websites and social media campaigns. As alleged above, Wassgren knew that EquiAlt had exceeded the limit on sales of unregistered securities issued by Fund 1 to unaccredited investors because the Investor Questionnaires were addressed and sent to Fox Rothschild and to DLA Piper.

78.     Knowing that the securities issued by Fund 1 were not exempt from registration because, among other things, the sales to unaccredited investors greatly exceeded the numerical limit permitted by Regulation D and other requirements for the claimed registration exemption, Wassgren hatched a scheme to paper over and conceal the ongoing securities law violations. Based on the advice and with the active and knowing assistance of Wassgren, EquiAlt formed a new investment fund known as EquiAlt Fund II LLC (Fund 2) on April 24, 2013. Wassgren prepared and filed the Articles of Organization for Fund 2 with the Nevada Secretary of State. Fund 2 began selling unregistered securities on May 2, 2013, approximately one week after Fund 2 was formed. However, Fund 2 did not file the required Form D with the SEC until March 31, 2016, nearly three years later. This late-filed Form D was untimely, as Regulation D requires that the necessary notice be filed no later than 15 days after the securities are first sold by the issuer. In the Form D for Fund

2, CEO Davison attested that the securities issued by Fund 2 were exempt from registration under Regulation D.

79.     The Fund 2 Form D attested that the total offering amount for the fund was $20 million and that, as of the filing date, Fund 2 had issued $6 million of unregistered securities to 88 investors. The Form D notice also attested that securities in the offering had been sold to 10 unaccredited investors. The initial Form D for Fund 2 further attested that no sales commissions had been paid to any agents and estimated that $250,000 in "Finders' Fees" had been paid in connection with the unregistered securities issued by Fund 2. The Form D filing attested that no portion of the offering proceeds would be paid to Davison, who was identified as the only any executive officer, director and promotor of Fund 2.

80.     The foregoing attestations in the initial Form D notice for Fund 2 were false in many material respects. Contrary to the representations in the Form D filing, Fund 2 already had sold unregistered securities to far more than 10 unaccredited investors, the fund had paid commissions to its sales agents, those commissions did not qualify as "Finders' Fees," the amount of those commissions was far greater than $250,000 (as sales commissions ranged from 10–12% of the amounts paid by investors), and Davison was not the sole promoter of the fund. Wassgren knew that these attestations in the Form D notice were false and that accordingly the securities issued by Fund 2 were not exempt from registration under the applicable federal and state securities laws.

81.     Moreover, as Wassgren knew, the scheme to split unaccredited investors between Fund 1 and Fund 2 was wholly ineffective to salvage the claimed registration exemption because the unregistered securities were being sold as part of an ongoing, integrated single offering. Among other things, the offerings were part of a single plan of financing, involved issuance of the same

class of security, were made at or about the same time, involved the same type of consideration and were made for the same general purpose. Furthermore, the safe harbor allowed by 17 CFR § 230.502 was not available because the offerings were not made more than six months apart with no offers of the same or similar securities being made in between. Thus, even if the number of unaccredited investors reported for Fund 1 and Fund 2 in the Form D filings were correct (which they were not), Wassgren knew there were at least 41 unaccredited investors in the single integrated offering (31 unaccredited investors in Fund 1 and 10 unaccredited investors in Fund 2), once again confirming that the funds were illegally selling unregistered securities using unlicensed sales agents in violation of the federal and state securities laws.

82.     Wassgren was well aware that the integrated serial funds that he advised EquiAlt to form in an attempt to deceive investors into believing that the Funds complied with the federal and state securities laws exposed EquiAlt and its managers to criminal prosecution and civil actions by investors. As Wassgren himself wrote in a 2016 article:

> [M]any developers may still need to turn to other forms of equity. In addition to crowdfunding, issuers may raise capital through more established exemptions such as Rule 506(b) and Rule 506(c). It is critical, however, that such developers or project sponsors seek the advice of securities counsel to ensure each offering complies fully with the associated rules and to prevent integration among multiple offerings, which could render each of them ineffective and, therefore, produce an illegal offering. As I have often counseled clients over the years, no one looks good in an orange jumpsuit. Even if criminal prosecutions for securities law violations are rare, they are best avoided, along with the associated civil actions brought by investors when securities laws have not been strictly followed.

P. Wassgren, "Thinking About Crowdfunding Your Next Syndicated Deal" (February 17, 2016) available at https://dailyproperties.com/real-estate-crowdfunding-rules-regulations/

83.     The pattern of false Form D filings by CEO Davison, all made with the knowledge and active assistance of Wassgren, continued over the following years. Fund 2 filed an amended Form D notice on April 26, 2016, less than a month after its initial Form D was filed. The amended

Form D for Fund 2 contained the same false statements as its initial Form D, but eliminated the language contained in the initial notice disclosing that Fund 2 sales agents were actively soliciting sales from investors residing in Arizona, California, Colorado, Massachusetts, Nevada and Utah. Davison amended the Fund 2 Form D in an attempt to withdraw the issuer's admission that sales agents were actively soliciting investors in the fund, which was inconsistent with Wassgren's attempt to evade the securities law violations by falsely characterizing the unlicensed sales agents as "consultants" receiving only "finders' fees."

84.     The Fund 2 Form D filing with the SEC was amended again on August 31, 2017 based on advice from attorney Wassgren. According to this new filing, since the prior amendment on April 26, 2017 Fund 2 had sold an additional $15 million of unregistered securities to an additional 121 investors. Yet, according to the new amended Form D, none of these additional investors was non-accredited and Fund D had paid no additional "finder's fees" for any of the new sales. As Wassgren had to know, these representations in the new amended Form D were patently false. Nonetheless, Davison with the approval of Wassgren once again falsely attested when signing that the contents of the Form D notice were true and correct.

85.     Wassgren arranged for the formation of another Nevada LLC, known as EquiAlt Fund III, on June 26, 2013. Although no Form D was ever filed for this short-lived fund, EquiAlt sold approximately $2.6 million of unregistered securities in it between July 2013 and December 2015. EquiAlt began to wind down this fund during 2015, when it transferred its properties to Funds 1 and 2, in exchange for payments from Funds 1 and 2 of $1.63 million. This fund was formally closed in June of 2016, using funds diverted from Funds 1 and 2 to redeem its obligations to remaining investors.

86.     On January 20, 2016, EquiAlt formed another Nevada LLC, named EA SIP LLC (Fund 3). EquiAlt began raising capital through the issuance of unregistered EquiAlt Securities by Fund 3 in April 2016. With the knowledge and active assistance of Wassgren, Fund 3 filed an initial Form D on August 5, 2016 for an offering in the total amount of $25 million. Like all of the Funds' prior SEC filings, the Fund 3 Form D contained a series of false attestations. Although Fund 3 began selling EquiAlt Securities and paying sales agent commissions four or five months earlier, its Form D represented that the first sale of unregistered securities had yet to occur, that there were no Fund 3 investors and that no commissions or finder's fees had been paid to agents. And, as with the other Form D filings, the initial Form D filed with the SEC for Fund 3 failed to disclose that Rybicki was a related person. Nonetheless, Davison falsely attested when signing that the contents of the Form D notice were true and correct.

87.     As alleged more fully below, in 2019 the SEC commenced an investigation of EquiAlt and its affiliated entities, including the Funds. DLA Piper attorneys, including Wassgren, represented EquiAlt and its managers in connection with the SEC investigation. Realizing that the jig was up, Wassgren assisted in the preparation of yet another amended Form D notice for Fund 1. By this point, according to the amended Form D, Fund 1 had raised funds from 1,089 investors totaling $103 million. The newly amended Form D belatedly disclosed that Rybicki was a related person for Fund 1 (as he always had been), and now disclosed that Fund 1 had paid "finders' fees" totaling $12,300,000.

### 2.     *Wassgren Derails Arizona's Investigation into EquiAlt's Operations*

88.     The SEC investigation was not the first fended off by Wassgren.

89.     In early 2013, the Arizona Securities Division ("ASD") had commenced an investigation into potential securities law violations by EquiAlt and its managers, including EquiAlt's illegal sales of unregistered securities. The ASD was investigating whether the EquiAlt

Securities were investment contracts, and hence securities requiring registration, rather than mere fixed-interest promissory notes.

90.     As part of the ASD investigation regulatory authorities sought documents and testimony from EquiAlt, Rybicki and various sales agents. EquiAlt and Rybicki were represented in the investigation by Fox Rothschild attorneys Wassgren and Ernest Badway. Thus, on January 30, 2013, attorney Ernest Badway informed the ASD that Fox Rothschild was "representing both Mr. Rybicki and EquiAlt Fund" and that documents would be produced in response to outstanding subpoenas on February 27, 2013. *See* Email from Badway to Millecam dated Jan. 30, 2013, attached as **Exhibit M.** Arrangements were thereafter made for Davison to be examined under oath on March 27, 2013 and for Rybicki to be examined by the ASD the following day.

91.     On March 26, 2013, at 1:43 PM, Rybicki sent an email to Fox Rothschild attorneys Badway and Wassgren marked "**Importance:** High." *See* March 26, 2013 Email Chain, attached as **Exhibit N**. Rybicki indicated that he had just spoken to a client and that Davison "wanted me to send the following information:"

> [ASD] Securities officer (Dee Morin) stated to the client that "we (Equialt) should be giving the client a deed of trust on every investment" if not than [sic] *this is a violation.*
>
> My issue with this is that I am going to be taking a lot of client phone calls in regard to this question. Can you clarify that this is accurate for what we are doing and how to answer this? Also if this is incorrect is there any way of getting a hold of this officer and explaining how this line of questioning and subsequent accusation is not acceptable?

*Id.* (emphasis added). Thus, Wassgren and the other Fox Rothschild attorney representing EquiAlt were on actual notice that, in the view of the Arizona Securities Division, the EquiAlt "Debentures" were, in reality, unregistered securities rather than traditional debt instruments, given the lack of any deed of trust or other collateral arrangement; and, that the issuance or sale of the unregistered securities was a violation of the Arizona Securities Act. Wassgren already knew,

of course, that the EquiAlt "Debentures" qualified as unregistered securities; that the Equialt "Debentures" had been sold by unlicensed sales agents; and also knew that none of the investors had been offered or given deeds of trust to collateralize their investments.

92.     Davison and Rybicki, concerned that Rybicki was "going to taking a lot of client phone calls in regard to this question" by the securities regulators, frantically asked Wassgren whether the ASD's conclusion was "accurate" and sought advice concerning "how [they should] answer this" accusation. *Id.* Wassgren replied to Rybicki's email within 30 minutes, stating that he had discussed Rybicki's concerns with Ernest Badway, and that they had developed the following messaging for the investors:

> Ernie and I spoke briefly, and **suggest that you advise your investors that the State of Arizona does not understand the deal structure**. Perhaps they will after we complete the examinations under oath.
>
> To be clear, the offering that we set up is an unsecured debt or promissory note offering. The company is offering a fixed return to all investors. This debt obligation is not secured by a deed of trust.
>
> **If your investors are in doubt, please feel free to mention that the company is represented by a national law firm that timely filed the securities exemption required under Arizona law.**

*Id.* (emphasis added). As Wassgren recommended, Rybicki passed the message crafted by Wassgren on to EquiAlt sales agents and as well to its investors.

93.     Wassgren's statements, made as part of his continuing, active assistance in EquiAlt's ongoing securities laws violations, falsely represented that the EquiAlt Securities were mere fixed rate promissory notes, when he knew that the EquiAlt debentures in actuality were unregistered securities. Moreover, Wassgren's representations that the EquiAlt Securities were exempt from registration based on timely filed securities exemptions were patently false for the reasons alleged above. Wassgren knew and intended that these false representations would be conveyed to the investors to assuage their concerns about the legality of the EquiAlt offerings, and

even encouraged Rybicki to comfort investors that EquiAlt was represented by the "national law firm" of Fox Rothschild.

94.     Wassgren thereafter continued to assist EquiAlt in furtherance of the ongoing Ponzi scheme. From 2016, Wassgren prepared and filed Articles of Organization in Florida for no less than 15 different limited liability companies formed by EquiAlt to acquire and hold properties purchased using investor funds.

95.     In addition, during 2018 Wassgren represented EquiAlt in the formation of a Real Estate Investment Trust known as the EquiAlt Secured Income Portfolio REIT (the "REIT"), a new entity into which EquiAlt intended to funnel existing investors holding EquiAlt Securities. DLA Piper was paid at nearly $500,00 in legal fees to form the new REIT directly from the bank account containing funds raised from the investors in the other Funds. The draft promotional materials for the REIT, attached as **Exhibit O**, identified "DLA Piper a renowned global law firm as our counsel."

96.     EquiAlt intended to raise funds for the REIT using unlicensed sales agents who were to receive substantial commissions for locating and securing new and existing investors. The offering documents for the REIT, once again prepared by Wassgren, contained misrepresentations and omitted material facts, comparable to those infecting the offering documents Wassgren prepared for the Funds.

97.     In reality, the REIT was formed with the active assistance and based on the advice of Wassgren, in an attempt to sanitize the securities laws violations associated with the prior offerings. Thus, $4.8 million of the $5.9 million raised for the REIT resulted from redemptions of EquiAlt Securities held by existing investors reinvesting in the REIT.

98.     Also, in 2018, Wassgren assisted the EquiAlt managers in forming yet another entity in furtherance of the fraudulent Ponzi scheme. The new fund, organized as a Qualified Opportunity Zone (the "QOZ") offering, purportedly would provide investors willing to hold for 10 years with a non-taxable compounded return of 6%. Once again, with the knowledge of Wassgren, Rybicki reached out to the network of unlicensed sales agents who were used to market and sell the EquiAlt unregistered securities. Also, like the REIT, the offering materials drafted by Wassgren for the QOZ were riddled with material misrepresentations and omissions concerning Davison and Rybicki, the ongoing securities laws violations (both the prior violations and those associated with the QOZ) and the financial failure of the EquiAlt Funds being operated as an ongoing Ponzi scheme.

**E.     The SEC Finally Shuts Down EquiAlt's Illegal Securities Sales**

99.      By the Spring of 2019, at the latest, the SEC commenced an investigation into the activities of EquiAlt, the Funds, Davison, and Rybicki styled as "In the Matter of Certain Unregistered Securities Transactions." As part of the investigation, the SEC issued subpoenas to the EquiAlt entities, Davison, and Rybicki, conducted on-site inspections at the EquiAlt offices and, in August of 2019, the SEC issued subpoenas for documents and testimony to various sales agents.

100.     Notwithstanding the fact that Wassgren and other DLA Piper lawyers were material witnesses to the underlying securities law violations, DLA Piper continued to represent EquiAlt, the EquiAlt Funds, Davison and Rybicki in the SEC investigation, with DLA Piper attorney Jessica Masella serving as lead counsel. In early September 2019, Rybicki sent emails to various sales agents who had received SEC subpoenas, recommending that they retain a single lawyer to represent them "so we don't have any issues with multiple representatives while going through this" SEC investigation. *See* Email from Rybicki dated Sept. 6, 2019, attached as **Exhibit P**.

Rybicki recommended, based on the advice of DLA Piper, that the agents retain attorney Amy Lester and told them that EquiAlt would "do our best to help with your cost for this but we really need to know how many Advisors have been or will be receiving a subpoena before we can commit to a dollar amount etc." *Id.*

101.    On February 11, 2020, the SEC commenced the SEC Action against EquiAlt and others to, among other things, halt the ongoing sale of the EquiAlt Securities, through which EquiAlt had by that time raised over $170 million from Plaintiffs and some 1,100 other investors nationwide, through the efforts of numerous unlicensed sales agents. *See* **Ex. A.**

102.    The EquiAlt Securities purchased by Plaintiffs are now worthless.

103.    Shortly after the SEC complaint against EquiAlt was unsealed and the SEC's allegations made public, DLA Piper scrubbed the DLA-EquiAlt Posts from its website.

**F.    The Non-Defendants Sales Agents Owed Plaintiffs Fiduciary Duties**

104.     Although the EquiAlt sales agents were not registered with the SEC or the Financial Regulatory Authority (FINRA) to sell securities, they have the same fiduciary duties as any FINRA registered financial advisor, broker or other SEC or state registered investment advisor.

105.     EquiAlt solicited and sold EquiAlt unregistered securities through EquiAlt authorized sales agents, who acted as *de facto* investment advisors or brokers or financial advisors.

106.    Each of the EquiAlt sales agents that sold EquiAlt Securities to the Plaintiffs were: (1) engaged in the business of effecting transactions in securities for the account of others, (2) received transaction-based commissions, (3) provided advice and recommendations as to investment in EquiAlt Securities, (4) actively solicited investments in EquiAlt Securities, and (5) held themselves out as investment advisors, so their mere failure to register as a "broker" or "investment advisor" does not excuse them from the fiduciary and other duties which attach to

such activities. Indeed, under Fla. Stat. 517.021 (14(a) ), it defines an "investment advisor" as "any person who receives compensation, ... and engages for all or part of her or his time, ... in the business of advising others as to the value of securities or as to the advisability of investments in, purchasing of, or selling of securities"), and similarly, under the SEC Act, 15 U.S.C. § 78c(a)(4), it defines "broker" to be "any person who engaged in the business of effecting transactions in securities for the account of others".

107.    Here, each of the EquiAlt sales agents who sold EquiAlt Securities received transaction based commissions.

108.    Further, the EquiAlt sales agents actively found investors, provided advice or valuation as to the merit of the EquiAlt investment, and received a commission on each sale.

109.    EquiAlt and its sales agents obtained the trust and confidence of the Plaintiffs by purporting to have superior knowledge and expertise in the EquiAlt investments, and, in each instance, in essence advised the Plaintiffs that their investment was backed by real estate, was a safe or secure fixed income investment, and that EquiAlt had a successful track record. The sales agents also gave out EquiAlt brochures to investors which stated that investors could contact EquiAlt's attorney and that it is "independent from EquiAlt LLC and can give you some insight into the fund and its activities." *See, e.g.,* Exs. G & H.

110.    Based on the totality of above information that was disseminated by EquiAlt and its sales agents, their representations of expertise or superior knowledge in EquiAlt investments and the purported safety of the EquiAlt investments, EquiAlt and its financial advisors gained the trust and confidence from the Plaintiffs, and that trust and confidence was reposed in EquiAlt and its financial advisors. This trust and confidence obtained from the Plaintiffs by EquiAlt sales agents and EquiAlt employees created a fiduciary duty owed to the Plaintiffs.

111.   EquiAlt and the EquiAlt financial advisors breached their fiduciary duty to the Plaintiffs via their misconduct, more particularly described throughout this complaint, including, but not limited to:

a.   Failing to disclose that the EquiAlt Securities were not exempt from registration;

b.   Failing to disclose that the EquiAlt Securities were being sold in violation of state and federal securities registration laws;

c.   Failing to disclose that EquiAlt Securities were sold via misrepresentations and omissions of material facts as described in this complaint;

d.   Failing to disclose that the EquiAlt Securities were sold by unlicensed sales agents, aka investment advisors or brokers, who were required by law to be licensed in order to sell EquiAlt Securities;

e.   Failing to disclose that EquiAlt was being operated as a Ponzi scheme, where later investors' monies were being used to pay interest returns and principal to earlier investors;

f.   Failing to disclose that EquiAlt's net income, without new investor money, was insufficient to pay its obligations as they came due in the ordinary course of their business;

g.   Failing to disclose that there were regulatory inquiries from regulators who were investigating the legality of the sale of EquiAlt Securities;

h.   Failing to adequately investigate the EquiAlt operations and investments, such as failing to obtain audited financial statements to confirm the viability of the EquiAlt investments;

i.   Failing to fully explain the risks of the EquiAlt Securities that were part of a Ponzi scheme;

j.   Failing to study the EquiAlt investments so as to be adequately informed as to its nature, price and financial prognosis;

k.   Failing to refrain from self-dealing in that the EquiAlt advisors knew that they did not have verifiable, audited financial information, but yet touted the EquiAlt investments as fully secured by real estate, in order to earn a large commission on each sale;

l.   Failing to contact their state securities regulator, FINRA or the SEC to confirm whether they could legally sell EquiAlt Securities without a license;

m.   Failing to contact their state securities regulator or the SEC to confirm whether EquiAlt Securities could be sold without registration or a proper exemption from registration; and

n.   Failing to obtain a securities license or registration as a broker-dealer before selling EquiAlt Securities.

**G.    Plaintiffs, and the Proposed Investor Classes, Alone Have Standing to Assert these Alleged Claims**

112.   On June 1, 2020, in *Isaiah vs. JP Morgan Chase*, the Eleventh Circuit Court of Appeals reaffirmed the standing of investors to assert their own claims independent of and unconstrained by any claims asserted or proceedings initiated by an SEC receiver. *Isaiah v. JP Morgan Chase*, 960 F.3d 1296 (11th Cir. 2020). The Eleventh Circuit confirmed that such receivers lack standing to bring tort claims against third parties that are otherwise owned by the investors. *Id.* The *Isaiah* court specifically stated that while a receiver is appointed to protect creditors' rights, it "cannot pursue claims owned directly by the creditors" and is "limited to bringing only those actions previously owned by the party in receivership." *Id.* The Eleventh Circuit also expressed concerns that the investor claims could become subject to limitations defenses if not timely asserted by the investors in their own right.

113.   Accordingly, under *Isaiah,* only Plaintiffs and the other similarly situated investors comprising the putative classes have standing to assert the claims alleged herein against Wassgren, DLA Piper and Fox Rothschild. The Receiver has no authority to assert those claims on behalf of

Plaintiffs, nor certainly can it with impunity take any actions to delay or otherwise prejudice those investor claims.

### H.     APPLICATION OF THE DISCOVERY RULE, THE FRAUDULENT CONCEALMENT DOCTRINE AND EQUITABLE TOLLING

114.     Plaintiffs and the class members had no reason to suspect they had sustained injuries caused by Defendants' wrongful conduct alleged herein until the SEC filed its complaint on February 11, 2020, or later and, despite reasonable investigation, Plaintiffs were unaware until then of a factual basis for the causes of action alleged herein. Plaintiffs and the class members likewise did not and could not reasonably have discovered the alleged breaches of fiduciary duties, misrepresentations and corresponding securities violations and fraud until the SEC filed its complaint, at the earliest.

115.     As alleged above, the EquiAlt marketing brochures, sales solicitation documents, PPMs and subscription agreements all made false representations and failed to disclose material information concerning the safety and liquidity of the EquiAlt Securities, the risks associated with investments in the EquiAlt Securities, EquiAlt's compliance with the securities laws, the experience and qualifications of EquiAlt management and the quality and values of the real estate previously acquired and to be acquired by the EquiAlt Funds.

116.     EquiAlt and Defendants never disclosed or suggested to Plaintiffs and the class members that EquiAlt and the EquiAlt funds were being operated as part of a massive Ponzi scheme or that the EquiAlt managers were diverting millions of dollars in EquiAlt assets for their own personal gain. Nor did EquiAlt or Defendants disclose to the investors that properties and assets were being transferred between and among the EquiAlt Funds in furtherance of the ongoing Ponzi scheme and breaches of fiduciary duties.

117.     Despite their periodic inquiries and efforts to monitor the status of their investments in the EquiAlt Securities, Plaintiffs and the class members lacked any ability to discover the true financial condition of the EquiAlt Funds or the profligate manner in which EquAlt was being managed and operated. EquiAlt provided no audited or unaudited financial statements to the investors, distributed no written reports describing or summarizing EquiAlt's operations or financial condition, nor did EquiAlt provide any specific information concerning the properties supposedly acquired, appraisals or appraised values of the properties, details concerning the acquisition or sales of the properties supposedly bought and sold by the EquiAlt Funds or any comparable information. To the contrary, all information concerning EquiAlts' operations, financial condition, profits and losses, intra-fund transfers, payments to management and the status of the properties acquired by the EquiAlt Funds and EquiAlt's securities law violations was and remained in the exclusive possession and control of EquiAlt management and/or Defendants.

118.     There was simply no possible avenue for Plaintiffs or the class members to pursue or obtain the information necessary for them to discover the wrongdoing alleged herein until the SEC filed its complaint revealing the Ponzi scheme, at the earliest.

119.     In addition, Plaintiffs and the class members could not reasonably have discovered the wrongdoing earlier due to the active, ongoing fraudulent concealment of the true facts by EquiAlt and the Defendants. Indeed, in addition to the fraudulent misrepresentations by EquiAlt management, Defendants made affirmative false representations to the investors in the PPMs and other documents drafted by Defendants concerning EquiAlt's compliance with the federal and state securities laws.

120.     Under the fraudulent concealment and equitable tolling doctrines applicable to the claims alleged herein, the limitations periods applicable to the claims asserted in this action were

tolled through February 11, 2020, at the earliest, based on the active deception of EquiAlt and the Defendants in concealing Plaintiffs' causes of action.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Plaintiffs Richard and Phyllis Gleinn

121.    Plaintiffs Richard and Phyllis Gleinn are husband and wife who reside in Sumter County, Florida. The Gleinns invested $50,000 in 2016, which investment matured in 2019. On April 11, 2019, Andre Sears reached out to the Gleinns to solicit them to reinvest with EquiAlt. At or about that time, between April 11, 2019 and April 25, 2019, they were again solicited to "renew" and "add to" their EquiAlt investment. The Gleinns invested $150,000 in EquiAlt Fund II on or about April 25, 2019 and sent their funds to EquiAlt on or about May 1, 2019. The Gleinn's EquiAlt investment contract is attached hereto as **Exhibit Q.**

### Plaintiff Cary Toone

122.    Plaintiff Cary Toone is a resident of Gilbert, Arizona. Following a solicitation by an unlicensed EquiAlt sales agent, Toone purchased $30,000 of Fund 2 on September 26, 2019 and $60,000 of EquiAlt Fund LLC for his IRA on April 8, 2019. Toone's EquiAlt investment contracts are appended hereto as **Exhibit R.** Toone is not an accredited investor.

### Plaintiffs John and Maria Celli

123.    Plaintiffs John and Maria Celli are husband and wife who reside in Prescott, Arizona and invested $50,000 in EquiAlt Securities on August 7, 2019. The Celli's Equilat investment contract is appended hereto as **Exhibit S.**

### Plaintiff Eva Meier

124.    Plaintiff Eva Meier is a resident of San Diego County, California and initially solicited to invest $100,000 from her IRA into EquiAlt Fund LLC and made the first investment

in or about September 29, 2017. In or about January 6, 2020, Meier invested additional monies with EquiAlt. On or about January 6, 2020, Meier invested $73,229.81 in EquiAlt Fund II from her beneficiary IRA account, an additional $74,716 in EquiAlt Fund II from her SEP IRA. Meier's Equilat' investment contract is appended hereto as **Exhibit T.**

### Plaintiff Georgia Murphy

125.    Plaintiff Georgia Murphy funded that $250,000 investment in or about December 21, 2016. Later, in or about January 30, 2018, Murphy was solicited by Armijo to transfer $150,000 from her EquiAlt Fund LLC investment and roll that into the EquiAlt Secured Income Portfolio. Murphy's EquiAlt investment contract is appended hereto as **Exhibit U.**

### Plaintiffs Steven and Tracey Rubinstein

126.    Plaintiffs Steven and Tracey Rubinstein are husband and wife, and serve as co-trustees of the Rubinstein Family Trust dated 6/25/2010. On January 31, 2020, the Rubinsteins purchased a $75,000 investment with Fund 2, at an annual rate of 8.00%, with a 48-month term. The Rubinstein's investment contract is appended hereto as **Exhibit V.**

### Plaintiff Bertram D. Greenberg

127.    Plaintiff Greenberg was on April 3, 2018, sold a $50,000 investment in Fund 1 at his home in Santa Clara County, California. Plaintiff Greenberg was 89 years of age at the time of the offer and sale of the EquiAlt Debenture. Greenberg's EquiAlt investment contract is appended hereto as **Exhibit W.**

### Plaintiffs Bruce R. and Geraldine Hannen

Plaintiffs Bruce R. and Geraldine Mary Hannen are spouses who were introduced to EquiAlt and the EquiAlt Debentures by unlicensed EquiAlt employees Andre Sears and Maria-Antonia Sears d/b/a The Picasso Group. On July 26, 2016, the Hannens purchased their first

EquiAlt Debenture, making a $200,000 investment with EquiAlt Fund II, at an annual rate of 9.25%, with a 36-month term. On July 13, 2019, and at the end of the 36-month term, the Hannens renewed their EquiAlt investment, purchasing an EquiAlt Debentures for $200,000 with EquiAlt Fund II, at an annual rate of 9.00%, with a 36-month term. The Hannens' investment contracts are appended hereto as **Exhibit X**.

## CLASS ALLEGATIONS

128.    Plaintiffs bring assert their claims on behalf of themselves and the following four classes of similarly situated investors in Florida, California, Arizona, and Colorado:

> **The Florida Class**: All Florida residents who were sold an EquiAlt Security.

> **The California Class**: All California residents who were sold an EquiAlt Security.

> **The California Elder Subclass**: All California residents who were at least 65 years of age when sold an EquiAlt Security.

> **The Arizona Class**: All Arizona residents who were sold an EquiAlt Security.

> **The Colorado Class**: All Colorado residents who were sold an EquiAlt security.

(collectively, "the Classes"). Excluded from the Classes are Defendants and EquiAlt, their officers, directors and employees, any broker-dealer or sales agent who sold an EquiAlt Security to any member of the Classes, and any member of the Classes who has initiated individual litigation against the Defendants predicated on the same facts alleged herein.

129.    *Size of Classes:* EquiAlt Securities were sold to approximately 1,100 investors nationwide, with hundreds of investors located in Florida, California, Arizona, and Colorado. Because there are hundreds of members of each of the Classes described in the foregoing

paragraph, joinder of all members is impracticable. The identities and addresses of the members of these Classes can be readily ascertained from business records maintained by EquiAlt.

130.   ***Adequacy of Representation***: Plaintiffs are willing and prepared to serve the Court and the proposed Classes in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Classes. The self-interests of Plaintiffs are co-extensive with and not antagonistic to those of absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members. Plaintiffs have engaged the services of counsel indicated below who are experienced in complex class litigation and life insurance matters, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and the putative Class members.

131.   ***The Commonality of Questions of the Law and Fact***: The claims of Plaintiffs and putative Class Members involve common questions of law and fact., including

a.   Whether the EquiAlt Securities constituted "securities" with the meaning of the Federal securities statutes;

b.   Whether the EquiAlt Securities were exempt from registration under the federal securities statutes;

c.   Whether the EquiAlt Securities constituted "securities" with the meaning of the pertinent State securities statutes;

d.   Whether the EquiAlt Securities were exempt from registration under the pertinent State securities statutes;

e.   Whether the sale of the EquiAlt Securities though the Funds constituted an integrated offering;

f.   Whether EquiAlt intended to sell and did in fact sell its securities to more than 35 non-accredited investors through the Funds;

g.   Whether EquiAlt engaged directly and through its agents in general solicitations and advertising to market its unregistered securities;

h.   Whether EquiAlt made commission payments to its unlicensed sales agents not disclosed in its SEC filings claiming the Reg D exemption from registration;

i.   Whether EquiAlt would and did fail to provide investors with information and disclosures required by Regulation D, including audited financial statements;

j.   Whether the EquiAlt PPMs contained materially false and misleading statements;

k.   Whether the EquiAlt Form D filings contained materially false and misleading statements;

l.   Whether Defendants were knowing participants in the ongoing illegal sales of securities by EquiAlt and the Non-Defendant Promoters;

m.   Whether Defendants played a substantial role in inducing the illegal sales of EquiAlt Securities;

n.   Whether Defendants lent substantial assistance to an ongoing scheme to defraud Plaintiffs and the other members of the Classes;

o.   Whether Defendants were professionally obligated to terminate their representation of EquiAlt to avoid covering-up and assisting the ongoing (and past) fraud perpetrated by it and the Non-Defendant Promoters;

p.   Whether Defendants' actions constitute primary violations of the pertinent State securities statutes;

q.  Whether Defendants' actions constitute secondary violations of the pertinent State securities statutes;

r.  Whether Defendants' actions constitute aiding and abetting of violations of the pertinent State securities statutes;

s.  Whether Defendants' actions constitute aiding and abetting fraud;

t.  Whether Defendants' actions constitute aiding and abetting breach of fiduciary duty;

u.  Whether Defendants' actions constitute civil conspiracy;

v.  Whether Defendants' actions constitute statutory Elder Abuse under California law;

w.  Whether Defendants' actions constitute a violation of any prong of California's unfair Competition Law;

x.  Whether Plaintiffs and members the Classes have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

y.  Whether Equialt sales agents were required to be licensed under state or federal securities laws;

z.  Whether Equialt was operating as an unlicensed broker-dealer; and

aa. Whether Plaintiffs and Members of the Classes are entitled to other, equitable relief.

132.  ***Typicality of the Claims or Defenses of the Class Representatives***: Plaintiffs' claims and defenses are typical of the claims and defenses of the putative Class Members.

133.  ***Rule 23(b)(3)***: This action is appropriate as a class action pursuant to Federal Rule of Civil Procedure 23 (b)(3). The common questions of law and fact listed above predominate over

any individualized questions. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a.  Given the age of Class Members, many of whom are elderly and have limited resources, the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs that Defendants have committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b.  Once Defendants' liability has been adjudicated respecting the EquiAlt Securities, claims of all Class Members can be determined by the Court;

c.  This action will ensure an orderly and expeditious administration of the Class's claims and foster economies of time, effort, and expense, and ensure uniformity of decisions; and

d.  This action does not present any undue difficulties that would impede its management by the Court as a class action.

A class action is thus superior to other available means for the fair and efficient adjudication of this controversy.

134.  ***Nature of Notice to the Proposed Classes.*** The names and addresses of all Class Members are contained in the business records maintained by Defendant and are readily available to Defendant. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## CLAIMS FOR RELIEF

## THE FLORIDA CLAIMS

## COUNT I

**Aiding and Abetting Fraud**
**(Individually and on behalf of the Florida Class)**

135.    Plaintiffs Gleinn repeat and re-allege the allegations contained in paragraphs 1–134 above, as if fully set forth herein.

136.    EquiAlt and its sales agents, consistent with the brochures, told Plaintiffs words to the effect that that their investment was backed by real estate, was a safe or secure fixed income investment, and that EquiAlt had a successful track record. The sales agents also gave out EquiAlt brochures to investors which stated that investors could contact EquiAlt's attorney and that it is "independent from EquiAlt LLC and can give you some insight into the fund and its activities.

137.    EquiAlt and the EquiAlt financial advisors made misrepresentations and omitted material facts to the Plaintiffs via their misconduct.

138.    The Defendants substantially assisted or encouraged the wrongdoing that constituted the Ponzi scheme fraud conducted EquiAlt and its unlicensed sales agents; further, Defendants had knowledge of such fraud, because they actively participated in the making the sale by their actions or by stepping outside of their normal role as attorneys providing routine legal advice, under the totality of the events as more fully described in this complaint.

139.    Defendants stepped out of their normal role as attorneys and participated in the fraud, by participating in the creation of documents which contain clear misstatements and omit material facts that should have been disclosed to the Plaintiffs, and by other actions described in this complaint.

140.    Defendants' aiding and abetting the EquiAlt fraud caused damages to the Plaintiffs in the amount of their lost investments, believed to be $170 million dollars, less interest payments.

## COUNT II

### Aiding and Abetting Breach of Fiduciary Duty
### (Individually and on behalf of the Florida Class)

141.    Plaintiffs Gleinns repeat and re-allege the allegations contained in paragraphs 1–134 above, as if fully set forth herein.

142.    As alleged above, EquiAlt and the EquiAlt sales agents breached their fiduciary duties to the Plaintiffs.

143.    The Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by the EquiAlt and its sales agents; further, Defendants had knowledge of such breach, because they actively participated in the making the sale by their actions or by stepping outside of their normal role as attorneys providing routine legal advice, under the totality of the events as more fully described in this complaint.

144.    Defendants' aiding and abetting the breach of fiduciary duty cannot be excused by a "see no evil, hear no evil" approach, as that would otherwise encourage attorneys to aid clients in fraud by willful blindness.

145.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to the Plaintiffs in the amount of their lost investments, believed to be $170 million dollars, less interest payments.

## COUNT III

### Civil Conspiracy
### (Individually and on behalf of the Florida Class)

146.     Plaintiffs Gleinn repeat and re-allege the allegations contained in paragraphs 1–134 above, as if fully set forth herein.

147.     EquiAlt and its sales agents, consistent with the brochures, told Plaintiffs that their investment was backed by real estate, was a safe or secure fixed income investment, and that EquiAlt had a successful track record. The sales agents also gave out EquiAlt brochures to investors. The sales agents also gave out EquiAlt brochures to investors which stated that investors could contact EquiAlt's attorney and that it is "independent from EquiAlt LLC and can give you some insight into the fund and its activities."

148.     EquiAlt's CEO entered into one or more agreements with Defendants to create various private placements to raise money for EquiAlt. That agreement included the drafting of indentures, finder fee contracts, subscription agreements and Private Placement Memoranda for each of the offerings.

149.     Defendants engaged in unlawful acts with EquiAlt, namely, the misrepresentation of EquiAlt private placements as properly exempt under the securities laws, and the use of unlicensed sales agents, which Defendants knew were not allowed to sell private placements without a proper securities license with state and federal regulators.

150.     The Defendants' conspiracy substantially assisted or encouraged the wrongdoing that constituted the Ponzi scheme fraud conducted by EquiAlt and its unlicensed sales agents; further, Defendants had knowledge of such fraud, because they actively participated in the making the sale by their actions or by stepping outside of their normal role as attorneys providing routine legal advice, under the totality of the events as more fully described in this complaint.

151.   Defendants' conspiracy with EquiAlt to evade the securities laws with respect to registration, exemption from registration and the use of unlicensed sales agents caused damages to the Plaintiffs.

152.   Defendants conspiracy with EquiAlt to commit fraud cannot be excused by a "see no evil, hear no evil" approach, as that would otherwise encourage attorneys to aid clients in fraud by willful blindness. Plaintiffs allege that the Defendants had actual knowledge, which can be inferred from the totality of the circumstances of the events plead in this complaint. Plaintiffs lack access to the very discovery materials which would illuminate the Defendants' state of mind. But participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud. Intent to commit fraud is to be divined from surrounding circumstances, and in this case, the Plaintiffs plead that the Defendants stepped out of their normal role as attorneys and participated in the fraud, by participating in the creation of documents which contain clear misstatements and omit material facts that should have been disclosed to the Plaintiffs, and by other actions described in this complaint.

153.   Defendants' conspiracy with EquiAlt to commit fraud caused damages to the Plaintiffs in the amount of their lost investments, believed to be $170 million dollars, less interest payments.

## THE CALIFORNIA CLAIMS

### COUNT IV

**Violations of the CSL**
**(Individually and on behalf of the California Class)**

154.   Plaintiffs Murphy, Meier, and Greenberg repeat and re-allege the allegations contained in paragraphs 1–134 above, as if fully set forth herein.

155.    California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

156.    EquiAlt with Defendants' material assistance offered and sold the EquiAlt Securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator.

157.    Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in EquiAlt's non-compliance with the CSL establishes their intent to deceive investors regarding the purported exemption of the EquiAlt Securities from the qualification and licensing requirements of the CSL.

158.    California Corp. Code § 25210(b) provides:

> No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

159.    Defendants breached Section 25210(b) by encouraging Lifeline and other broker-dealers and agents to offer and sell the EquiAlt Securities despite the fact that (a) such securities were not qualified under the CSL and (b) such broker-dealers and agents were not licensed under the CSL.

160.    California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

161.    California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25401 with the intent to deceive or defraud, and makes them jointly and severally liable with any other person liable under Section 25503.

162.    EquiAlt with Defendants' material assistance offered and sold the EquiAlt Securities in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

163.    Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code. § 25504.1.

164.    Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with Cal. Corp. Code § 25503.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty
### (Individually and on behalf of the California Class)

165.    Plaintiffs Murphy, Meier and Greenberg repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

166.    Based on (a) their respective sales agent's assumption of the role of a securities broker advising Plaintiffs about their retirement and investment decisions and (b) the confidential relationship the agent engendered in completing Plaintiffs' applications, transmitting them and

Plaintiffs' funds to EquiAlt for investment, those sales agents owed Plaintiffs fiduciary duties of loyalty and full disclosure, which were breached by their receipt of commissions in connection unlawful offer and sale to Plaintiffs of unqualified securities through unlicensed broker-dealers and sales agents.

167.    Defendants had actual knowledge of the breaches of such fiduciary duties by the sales agent and the other unlicensed broker-dealers EquiAlt utilized to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the breaches, and their conduct was a substantial factor in causing harm to Plaintiff.

168.    Defendants acted with the specific intent to facilitate the wrongful conduct by EquiAlt and its broker-dealers and sales agents, particularly in connect with its efforts to deter regulatory investigations by the SEC and the State of Arizona.

169.    Defendants are therefore liable for common law aiding and abetting the breach of fiduciary duties.

## COUNT VI

### Aiding and Abetting Fraud and Deceit
### (Individually and on behalf of the California Class)

170.    Plaintiffs Murphy, Meier and Greenberg repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

171.    The Non-Defendant Promoters made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors.

172.    Plaintiffs and the members of the California Class justifiably relied on the foregoing false representations and material omissions, were unaware of the falsity of the representations or

the material omissions and would not have invested in the EquiAlt Securities had they known the true facts. As a consequence, Plaintiffs and the members of the California Class sustained damages.

173.     Defendants had actual knowledge of some or all of the false statements and material omissions used to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the fraudulent conduct, and their conduct was a substantial factor in causing harm to Plaintiffs and the members of the California Class.

174.     Defendants acted with the specific intent to facilitate the foregoing wrongful conduct.

175.     Defendants are therefore liable for common law aiding and abetting the fraud and deceit committed by the Non-Defendant Promotors.

176.     The foregoing actions by Defendants were done maliciously, oppressively, and with intent to defraud, thereby entitling Plaintiffs and members of the California Class to punitive and exemplary damages.

## <u>COUNT VII</u>

**Financial Abuse under the Elder Abuse Act**
**(Individually and on behalf of the California Subclass)**

177.     Plaintiff Greenberg repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

178.     This cause of action is brought under California's Welfare and Institutions Code § 15610, et seq.

179.     As alleged above, Plaintiff Greenberg was 89 years or older at all times relevant to this claim.

180.     California's Elder Abuse Act, Cal. Welf. & Ins. Code § 15610.07, affords a cause of action to person over 65 years of age to recover for "financial abuse."

181.    Financial abuse is in turn defined as follows:

"Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

1.    Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

2.    Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

*** 

California Welf. & Ins. Code § 15610.30(a).

182.    A person takes property "for a wrongful use" when he, she or it knew or should have known its conduct was likely to be harmful to the elder. Welf. & Ins. Code § 15610.30(b).

183.    The sale of unregistered securities by unlicensed broker-dealers and agents is specifically prohibited in California, for the very reason that it is conduct likely to be harmful to the investor.

184.    Through the sale to Plaintiff Greenberg of unqualified securities through unlicensed brokers and agents, Defendants engaged in conduct that took, appropriated, obtained and retained Plaintiff Greenberg's personal property ($50,000 in cash) for a wrongful use in violation of Section 15610.30(a)(1).

185.    Alternatively, through their participation in the offer and sale to Plaintiff Greenberg of unqualified securities through unlicensed brokers and agents, Defendants at a minimum assisted in conduct that took, appropriated, obtained and retained Plaintiff Greenberg's personal property ($50,000 in cash) for a wrongful use in violation of § 15610.30(a)(2).

186.    Defendants are accordingly liable to Plaintiff for "compensatory damages and all other remedies otherwise provided by law," including reasonable attorney fees and costs. Welf. & Ins. Code § 15657.5(a).

## COUNT VIII

### Violation of Unfair Competition Law Business & Professions Code § 17200, et seq. (Individually and on behalf of the California Class)

187.    Plaintiffs Murphy, Meier, and Greenberg repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

188.    California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

189.    Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

190.    The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offends public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

191.    Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## THE ARIZONA CLAIMS

### COUNT IX
### Violation of A.R.S. § 44-1841
### (Individually and on behalf of the Arizona Class)

192.    Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

193.    The investments sold by the Non-Promotor Defendants were securities as defined by the Arizona Securities Act ("the ASA").

194.    The sale of non-exempt unregistered securities in Arizona is prohibited by A.R.S. § 44-1841.

195.    Section 44–2001(A) creates a private cause of action for rescission or damages for violations of § 44–1841.

196.    The ASA extends civil liability beyond the immediate parties to the sale, to all persons "who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44–2003(A).

197.    Defendants "participated in or induced" the unlawful sale of unregistered EquiAlt Securities, by encouraging their offer and sale, among other things preparing the offering documents designed to unlawfully solicit purchasers of the unregistered EquiAlt Securities knowing they were not exempt from registration under the federal and State securities laws, and deterring state regulators from terminating the offering in Arizona.

198.    Defendants are thus jointly and severally liable to Plaintiffs under A.R.S. § 44-2003(A), to the same extent as the Non-Promoter Defendants for the unlawful sale and violations of A.R.S. § 44-1841.

199.     Plaintiffs accordingly demand rescission with interest and attorneys' fees as provided in A.R.S. § 44-2001(A).

200.     Subject to the recovery of full relief, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).

## COUNT X

### Violation of A.R.S. §44-1842
### (Individually and on behalf of the Arizona Class)

201.     Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

202.     The investments sold by the Non-Promotor Defendants were securities as defined by the ASA.

203.     The sale of securities in Arizona by an unregistered dealer is prohibited by A.R.S. § 44-1842.

204.     Section 44–2001(A) creates a private cause of action for rescission or damages for violations of § 44–1842.

205.     The ASA extends civil liability beyond the immediate parties to the sale, to all persons "who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44–2003(A).

206.     Defendants "participated in or induced" the unlawful sale of EquiAlt Securities by unregistered dealers, by encouraging such sales in Arizona, by among other things covering for the Non-Defendant Promoters' use of the Non-Defendants sales agents to solicit purchasers of the EquiAlt Securities in Arizona.

207.    Defendants are thus jointly and severally liable to Plaintiffs under A.R.S. § 44-2003(A), to the same extent as the Non-Promoter Defendants for the unlawful sale and violations of A.R.S. § 44-1842.

208.    Plaintiffs accordingly demand rescission with interest and attorneys' fees as provided in A.R.S. § 44-2001(A).

209.    Subject to the recovery of full relief, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).

### COUNT XI

**Violation of A.R.S. §§ 44-1991(A)**
**(Individually and on behalf of the Arizona Class)**

210.    Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

211.    The investments sold by the Non-Promotor Defendants were securities as defined by the ASA.

212.    Under the ASA, it is unlawful to (1) "[e]mploy any device, scheme or artifice to defraud[;]" (2) "[m]ake any untrue statement of material fact, or omit to state any material act necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[;]" or to (3) "[e]ngage in any transaction, practice or course of business which operates or would operate as a fraud or deceit." A.R.S. § 44-1991(A).

213.    Section 44–2001(A) creates a private cause of action for rescission or damages for violations of § 44–1991(A). The ASA extends civil liability beyond the immediate parties to the sale, to all persons "who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44–2003(A).

214.    The Non-Promoter Defendants conducted a massive Ponzi scheme raising more than $170 million from over 1,000 investors nationwide, many of them elderly, through the fraudulent sale of unregistered securities. The scheme was perpetuated through material misrepresentations and omissions concerning the Funds' compliance with the federal and State securities laws, the safety and risks of the EquiAlt Securities, and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors, causing Plaintiffs' damages. In particular, the Non-Defendant Promotors in the PPM made the following materially false misrepresentations and omissions, among others:

a.  Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

b.  Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

c.  Falsely stated that "[u]nder no circumstances will the Company admit more than thirty-five (35) non-accredited Investors as computed under Rule 501 of Regulation D promulgated under the [Securities] Act;"

d.  Falsely stated that "[t]he Company may utilize the services of one or more registered broker/dealers" to sell the unregistered EquiAlt Securities;

e.  Falsely overstated the percentage of investor funds that would be used to invest in properties;

f.  Misleadingly omitted to disclose that millions of dollars would be used to pay undisclosed fees and bonuses to EquiAlt and its principals;

g.  Misleadingly omitted to disclose that EquiAlt would pocket "discount fees" rather than passing on to the Funds purported savings from listed sale prices;

h.  Misleadingly omitted to disclose that monies would be transferred from one Fund to another to pay interest due to investors and failed to adequately disclose that commissions would be paid to unlicensed sales agents; and

i.  Misleadingly omitted to disclose that Davison and Rybicki had both filed bankruptcy proceedings during the years prior to the formation of EquiAlt.

215.  Defendants "participated in or induced" the unlawful sale of EquiAlt Securities, by encouraging their offer and sale in Arizona, by among other things preparing the offering documents designed to unlawfully solicit purchasers of the unregistered EquiAlt Securities, by adding a patina of legitimacy to the otherwise unlawful operation, and by concealing the lack of any exemption to registration under either the federal or State securities laws, all of which enabled the scheme to unfold to the detriment of Plaintiffs and the Arizona Class.

216.  Defendants acted with the specific intent to facilitate the Non-Defendant Promoters' foregoing wrongful conduct, and knowingly or recklessly misrepresented or omitted facts regarding the need to register the securities that rendered their statements, representations, and documents materially false or misleading.

217.   Defendants are thus jointly and severally liable to Plaintiffs within the meaning of A.R.S. § 44-2003(A), to the same extent as the Non-Promoter Defendants for the unlawful sale and violations of A.R.S. § 44-1991(A).

218.  Plaintiffs accordingly demand rescission with interest and attorneys' fees as provided in A.R.S. § 44-2001(A).

219.     Subject to the recovery of full relief, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).

## COUNT XII

### Aiding and Abetting Fraud
### (Individually and on behalf of the Arizona Class)

220.     Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

221.     The Non-Defendant Promoters made uniform and materially false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the federal and State securities laws, the safety and risks of the EquiAlt Securities, the use of funds raised through the EquiAlt Securities, and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors, causing Plaintiffs' damages.

222.      In particular, the Non-Defendant Promotors in the PPM made the following materially false misrepresentations and omissions, among others:

  a.   Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

  b.   Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

  c.   Falsely stated that "[u]nder no circumstances will the Company admit more than thirty-five (35) non-accredited Investors as computed under Rule 501 of Regulation D promulgated under the [Securities] Act;"

d.  Falsely stated that "[t]he Company may utilize the services of one or more registered broker/dealers" to sell the unregistered EquiAlt Securities;

e.  Falsely overstated the percentage of investor funds that would be used to invest in properties;

f.  Misleadingly omitted to disclose that millions of dollars would be used to pay undisclosed fees and bonuses to EquiAlt and its principals;

g.  Misleadingly omitted to disclose that EquiAlt would pocket "discount fees" rather than passing on to the Funds purported savings from listed sale prices;

h.   Misleadingly omitted to disclose that monies would be transferred from one Fund to another to pay interest due to investors and failed to adequately disclose that commissions would be paid to unlicensed sales agents; and

i.  Misleadingly omitted to disclose that Davison and Rybicki had both filed bankruptcy proceedings during the years prior to the formation of EquiAlt.

223.    Defendants were for all times material hereto aware that the information being disseminated by the Non-Defendant Promoters was materially false.

224.    Defendants nevertheless rendered substantial assistance and encouragement to the Non-Defendant Promoters' fraudulent conduct, including but not limited to the drafting of the operative PPMs, Subscription Agreements, the EquiAlt Securities, and related organizational and operational agreements and other various regulatory filings, and their several corresponding acts to conceal, omit, and misrepresent material facts to cover up the illicit nature of the Ponzi scheme, all as alleged above with specificity.

225.    Defendants thereby aided and abetting the fraud and deceit committed by the Non-Defendant Promotors.

226.   Defendants are accordingly jointly and severally liable to Plaintiffs for the fraudulent actions of the Non-Defendant Promoters.

## COUNT XIII

### Aiding and Abetting Breach of Fiduciary Duty
### (Individually and on behalf of the Arizona Class)

227.   Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

228.   The Non-Defendant EquiAlt sales agents who solicited Plaintiffs' investments owed fiduciary duties to Plaintiffs, which derived from their confidential and principal-agent relationship.

229.   Given the unbalance of knowledge, Plaintiffs relied heavily upon the Non-Defendant EquiAlt sales agents' representations and advice, and reposed significant trust in the Non-Defendant EquiAlt sales agents.

230.   As alleged above, the Non-Defendant EquiAlt sales agents breached their duties to Plaintiffs, including through their receipt of undisclosed and illegal commissions in connection with the unlawful offer and sale to Plaintiffs of unregistered securities through unlicensed broker-dealers and sales agents, causing Plaintiffs damages.

231.   Defendants had actual knowledge of the Non-Defendant EquiAlt sales agents' breaches of fiduciary duties.

232.   Defendants rendered substantial assistance and encouragement to the Non-Defendant EquiAlt sales agents' breaches and acted to conceal material facts attendant to those breaches, by encouraging them to offer and sell the EquiAlt Securities despite knowing of (a) the lack of registration under either federal or State law, and (b) the lack of any applicable exemption to registration under federal or State law.

233.    Defendants are accordingly jointly and severally liable to Plaintiffs for the breach of fiduciary duties by the Non-Defendant Promoters' sales agents.

234.    The Non-Defendant Promoters themselves owed fiduciary duties to Plaintiffs under Arizona law.

235.    As alleged above, the Non-Defendant Promoters breached their fiduciary obligations to Plaintiffs, including the use through uniform and materially false representations and concealment of material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities, and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors, causing Plaintiffs damages.

236.    The Non-Defendant Promoters' breaches of fiduciary duties caused Plaintiffs' damages.

237.    Defendants had actual knowledge of the Non-Defendant Promoters' breaches of fiduciary duties and knew the misrepresentations and omissions were materially misleading and would result in harm.

238.    Defendants rendered substantial assistance and encouragement to the Non-Defendant Promoters' breaches of fiduciary obligations, including but not limited to the drafting of the operative PPMs, Subscription Agreements, the EquiAlt Securities, and related operational agreements and regulatory filings, and their several corresponding acts to conceal, omit, and misrepresent material facts as set forth in those documents to cover up the illicit nature of the Ponzi scheme, all as alleged with specificity herein.

239.    Defendants are accordingly jointly and severally liable to Plaintiffs for the breach of fiduciary duties by the Non-Defendant Promoters.

## **THE COLORADO CLAIMS**

### **COUNT XIV**

**Statutory Aiding and Abetting Anti-Fraud Violations under the CSA**
**(Individually and on behalf of the Colorado Class)**

240.    Plaintiffs Hannen repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

241.    The EquiAlt Securities are securities within as defined by C.R.S. § 11-51-201.

242.    C.R.S. § 11-51-501 ("Section 501") prohibits fraud in the offer or sale of securities in Colorado. C.R.S. § 11-51-604 ("Section 604") affords a statutory cause of action to victimized investors for violations of Section 501. Finally, C.R.S. § 11-51-604(5)(c) extends liability under Section 501 to "[a]ny person who knows that another person liable under subsection (3) or (4) of this section is engaged in conduct which constitutes a violation of [Section 501] and who gives substantial assistance to such conduct is jointly and severally liable to the same extent as such other person."

243.    The Non-Defendant Promoters sold the EquiAlt Securities by employing devices, schemes, and/or artifices to defraud; by making untrue statements of material facts and/or omitting to state material facts; and/or by engaging in acts, practices, and/or courses of business which operated as a fraud or deceit upon Plaintiffs and the other members of the Colorado Class, in violation of Section 501. Accordingly, Plaintiffs were the purchasers of a "security" in Colorado, the Non-Promoters acted in violation of Section 501 with the requisite scienter in connection with the offer and sale of that security, and Plaintiffs relied upon their conduct to their detriment, causing the Plaintiffs' injury.

244.     Defendants encouraged EquiAlt and its broker-dealers and agents to offer and sell the EquiAlt Securities in Colorado despite the fact that (a) such securities were not registered under the CSA and (b) such broker-dealers and agents were not licensed under the CSA.

245.     Defendants knew that the Non-Defendant Promoters were engaged in conduct which constituted a violation of Section 501, and gave substantial assistance to such conduct, and are therefore jointly and severally liable to Plaintiff Hannen and the Colorado Class.

246.     *Respondeat superior* is proper basis for liability under the CSA.

247.     Defendants are liable to Plaintiffs and the other members of the Colorado Class under Section 604(3) and (4) for rescission or rescissionary damages.

248.     Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with Section 604(6).

### COUNT XV

**Aiding and Abetting Registration Violations under the CSA**
**(Individually and on behalf of the Colorado Class)**

249.     Plaintiffs Hannens repeat and re-allege the allegations contained paragraphs 1–134 above, as if fully set forth herein.

250.     C.R.S. § 11-51-301 ("Section 310") prohibits the offer or sale by any person in Colorado of securities that are not registration in accordance with C.R.S. Art. 51. C.R.S. § 11-51-604 ("Section 604") affords a statutory cause of action to victimized investors for violations of Section 301.

251.     The EquiAlt Securities were required to be registered under Article 51 of Tile 11 of the Colorado revised Statute, pursuant to Section 301.

252.     Neither the EquiAlt Securities nor the transactions were exempted under any pertinent Colorado statute.

253.   The Non-Defendant Promoters with Defendants' material assistance offered and sold the EquiAlt Securities in Colorado without being properly registered for offer or sale either with any federal or Colorado regulator.

254.   Defendants breached Section 301 by encouraging broker-dealers and agents to offer and sell the EquiAlt Securities in Colorado despite the fact that (a) such securities were not registered under the CSA, and (b) such broker-dealers and agents were not licensed under the CSA.

255.   Section 604 specifically provides that statutory liability under that rights and remedies provided by the CSA are in addition to any other rights or remedies that may exist at law or in equity.

256.   Respondeat superior is a proper basis for claim under the CSA.

257.   Defendants are accordingly joint and severally liable to Plaintiffs and the other members of the Colorado Class for rescission or rescissionary damages.

258.   Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with Section 604(6).

## COUNT XVI

### Aiding and Abetting Breach of Fiduciary Duty
### (Individually and on behalf of the Colorado Class)

259.   Plaintiffs Hannen repeat and re-allege the allegations contained paragraphs 1–134 above,  as if fully set forth herein.

260.    As alleged above, based on (a) their respective sales agent's assumption of the role of a securities broker advising Plaintiffs about their retirement and investment decisions and (b) the confidential relationship the agent engendered in completing Plaintiffs' applications, transmitting them and Plaintiffs' funds to EquiAlt for investment, those sales agents owed Plaintiffs fiduciary duties, which were breached as alleged above, including by their receipt of

commissions in connection unlawful offer and sale to Plaintiffs of unqualified securities through unlicensed broker-dealers and sales agents.

261.    Defendants had actual knowledge of the breaches of such fiduciary duties by the sales agent and the other unlicensed broker-dealers EquiAlt utilized to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the breaches, and their conduct was a substantial factor in causing harm to Plaintiff.

262.    Defendants acted with the specific intent to facilitate the wrongful conduct by EquiAlt and its broker-dealers and sales agents, particularly in connect with its efforts to deter regulatory investigations by the SEC and the State of Arizona.

263.    Defendants are therefore liable for common law aiding and abetting the breach of fiduciary duties.

## COUNT XVII

### Aiding and Abetting Fraud and Deceit
### (Individually and on behalf of the Colorado Class)

264.    Plaintiffs Hannen repeat and re-allege the allegations paragraphs 1–134 above, as if fully set forth herein.

265.    The Non-Defendant Promoters made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors.

266.    Plaintiffs and the members of the Colorado Class justifiably relied on the foregoing false representations and material omissions, were unaware of the falsity of the representations or the material omissions and would not have invested in the EquiAlt Securities had they known the true facts. As a consequence, Plaintiffs and the members of the Colorado Class sustained damages.

267.     Defendants had actual knowledge of some or all of the false statements and material omissions used to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the fraudulent conduct, and their conduct was a substantial factor in causing harm to Plaintiffs and the members of the Colorado Class.

268.     Defendants acted with the specific intent to facilitate the foregoing wrongful conduct.

269.     Defendants are therefore liable for common law aiding and abetting the fraud and deceit committed by the Non-Defendant Promotors.

270.     The foregoing actions by Defendants were done maliciously, oppressively, and with intent to defraud, thereby entitling Plaintiffs and members of the Colorado Class to punitive and exemplary damages.

## COUNT XVIII

### Aiding and Abetting Intentional Misrepresentation
### (Individually and on behalf of the Colorado Class)

271.     Plaintiffs Hannen repeat and re-allege the allegations contained paragraphs 1–134 above,  as if fully set forth herein.

272.     The Non-Defendant Promoters made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds.

273.     The Non-Defendant Promotors knew the statements were false when made or were made recklessly and without regard to their truth, and intended that Plaintiffs and the members of the Colorado Class would rely on the representations.

274.   Plaintiffs and the members of the Colorado Class justifiably relied on the false statements and sustained damages as a result.

275.   Defendants had actual knowledge of some or all of the false statements and material omissions used to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the fraudulent conduct, and their conduct was a substantial factor in causing harm to Plaintiffs and the members of the Colorado Class.

276.   Defendants are therefore liable for common law aiding and abetting the intentional misrepresentations by the Non-Defendant Promotors.

277.   The foregoing actions by Defendants were done maliciously, oppressively, and with intent to defraud, thereby entitling Plaintiffs and members of the Colorado Class to punitive and exemplary damages.

## PRAYER

Based on the foregoing, Plaintiffs request the Court enter a judgment:

A.   certifying the Classes;

B.   awarding such declaratory, injunctive and other equitable relief as warranted under the claims asserted;

C.   awarding compensatory damages and punitive damages to Plaintiffs and the Classes, in an amount to be determined at trial;

D.   awarding Plaintiffs and the Classes the costs of this action, including reasonable attorneys' fees and expenses, including pursuant to the Elder Abuse Act; and

E.   awarding such further relief as may be just and proper.

RESPECTFULLY SUBMITTED this 21st day of July, 2020.

By: *s/ Adam M. Moskowitz* Adam M.
Moskowitz, Esq. Fla. Bar No. 984280
Adam@moskowitz-law.com
Fla. Bar No. 0364230
Adam A. Schwartzbaum
Fla. Bar No. 93014
Adams@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601 Coral Gables,
Florida 33134 Telephone: (305) 740-1423
Facsimile: (786) 298-5737


Andrew S. Friedman, Esq.
(to be admitted *pro hac vice*)
afriedman@BFFB.com
**Francis J. Balint, Jr., Esq. (to be admitted
pro hac vice) fbalint@BFFB.com
BONNETT FAIRBOURN
FRIEDMAN & BALINT, P.C.**

2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199


Jeffrey R. Sonn, Esq. Fla. Bar. No. 773514
**SONN LAW GROUP PA**
One Turnberry Place
19495 Biscayne Blvd. Suite 607
Aventura, FL 33180
Tel. 305-912-3000
Fax: 786-485-1501
jsonn@sonnlaw.com

*Attorneys for Plaintiffs*